

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 21, 2017**

United States Bankruptcy Judge

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 16-34788-sgj-7** |
| **STEVEN ANDREW CLEM,** | § | **(Chapter 7)** |
| Debtor. | § | |

| | | |
|---|---|---|
| **LADAINIAN & LATORSHA TOMLINSON,** | § | |
| Plaintiffs, | § | |
| | § | |
| **vs.** | § | **ADVERSARY NO. 17-03021-sgj** |
| | § | |
| **STEVEN ANDREW CLEM,** | § | |
| Defendant. | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF JUDGMENT ESTABLISHING A NONDISHARGEABLE DEBT PURSUANT TO SECTION 523(a)(2)(A)

CAME ON FOR TRIAL on August 23, 2017 and October 11, 2017 (the "Trial"), the above-referenced Adversary Proceeding (herein so called) filed by LaDainian and LaTorsha Tomlinson (collectively, the "Plaintiffs-Creditors" or the "Tomlinsons"), in which the Plaintiffs-Creditors objected to the dischargeability of a debt owed to them by the Defendant-Chapter 7 Debtor, Steven

1

Andrew Clem (the "Defendant-Debtor"), pursuant to section 523(a)(2)(A) of the Bankruptcy Code. The court has determined that the Plaintiffs-Creditors have established a nondischargeable debt, pursuant to section 523(a)(2)(A) of the Bankruptcy Code, as further set forth herein. The court issues these Findings of Fact and Conclusions of Law in support of this decision, pursuant to Fed. R. Bankr. Pro. 7052. Any Finding of Fact that should more properly be characterized as a Conclusion of Law should be deemed as such, and *vice versa*.

## I.  INTRODUCTION.

The Adversary Proceeding is a nondischargeability action in which section 523(a)(2)(A) of the Bankruptcy Code is at issue. It involves a contract (the "Contract") entered into on April 30, 2015, between the Tomlinsons and Bella Vita Custom Homes, LLC ("Bella Vita"), for a $4,483,185.72 luxury, custom-built home (the "Home") in North Texas. The Defendant-Debtor was the "chief executive officer" of the homebuilder, Bella Vita, and was also the approximately 50% owner of Bella Vita (with his father and father-in-law collectively owning the remaining 50% of Bella Vita).[1] The Tomlinsons' Home (at 18,000 square feet) would be the largest house that Bella Vita ever contracted to build.

Things went significantly awry with the early construction efforts on the Home. Among other things, Bella Vita admittedly undertook undisclosed/unapproved construction changes. Specifically, Bella Vita made the decision to utilize helical steel piers on the large Home— something atypical and that the Defendant-Debtor and Bella Vita had no experience using in the past—instead of the concrete piers that were specified in the Contract's original design plans. Bella Vita made this decision after encountering subsurface water when drilling holes for the

---

[1] More specifically, Bella Vita's Amended Statement of Financial Affairs filed in its bankruptcy case (Case No. 16-34790-bjh-7), which this court may take judicial notice of, shows that Steven A. Clem owned 48.6% of Bella Vita, Michael Clem, Steven Clem's father, owned 34.7%, and Fred Treffinger, Steven Clem's father-in-law, owned 16.7%. *See* DE # 42 in *In re Bella Vita Custom Homes, LLC* (Case No. 16-34790-bjh-7).

contemplated concrete piers (something that should have been foreseeable because of available reports), and after further realizing that the concrete piers would have to be "cased" because of instability in the holes Bella Vita had drilled.  The Contract provided that any change in the building plans required written approval of the Plaintiffs-Creditors.  Not only did Bella Vita not obtain written approval from the Plaintiffs-Creditors for the switch to helical piers (or disclose initially that helical piers were being substituted) but, while drilling for installation of the helical piers, Bella Vita and/or its subcontractors failed to locate and punctured a water line—causing extensive flooding on the building pad and adjacent land.  The Tomlinsons learned (rather belatedly) about the flooding from a neighbor.  In addition to these construction issues, the Tomlinsons grew frustrated with Bella Vita for its alleged failure to account for usages of the Tomlinsons' 10% initial deposit and subsequent draw requests.  On August 7, 2015, after the Plaintiffs-Creditors had paid $655,318.57 toward the purchase price of the Home, they terminated the Contract.  From there, the disputes between the Plaintiffs-Creditors and Defendant-Debtor escalated and evolved into many stages.

**Stage One: Prepetition Arbitration**.  On September 8, 2015, the Plaintiffs-Creditors filed a lawsuit against both Bella Vita and the Defendant-Debtor in the 153rd Judicial District Court of Tarrant County, Texas (the "State Court").    That court ordered the parties to participate in arbitration with the American Arbitration Association (the "Prepetition Arbitration").    The Plaintiffs-Creditors asserted numerous causes of action in the Prepetition Arbitration including at least the following:  breach of contract/breach of warranty (Count A); negligence and malice/gross negligence (Count B); negligent misrepresentation (Count C); violations of numerous provisions of the Texas Deceptive Trade Practices Act ("DTPA")[2] (Count D); fraud and fraud in the

---

[2] TEX. BUS. & COM. CODE ANN. §§ 17.41 et seq. (West 2017).

inducement or by nondisclosure (Count E); fraud in a real estate transaction (Count F); unconscionable, knowing, or intentional course of action (Count G); conversion (Count H); and various other doctrines or remedies were pleaded (estoppel, alter ego, and joint enterprise).[3] Approximately a year later, on September 26, 2016, the Plaintiffs-Creditors were awarded damages by an arbitration panel (the "Arbitration Panel") against both the Defendant-Debtor and Bella Vita, jointly and severally, in the amount of $744,711—which was later adopted into a Final Judgment Confirming Arbitration Award entered by the State Court on September 30, 2016 (the "Arbitration Award").[4]

The Arbitration Award is somewhat confusing. It recited various instances in which Bella Vita and the Defendant-Debtor failed to comply with the Contract. More importantly (for purposes of this section 523(a)(2)(A) Adversary Proceeding), the Arbitration Award also recited various examples of *false representations made by Defendant-Debtor (for example, the Defendant-Debtor falsely represented that he would put a full-time superintendent, full-time project manager, and full-time project liaison on the Plaintiffs-Creditors' job and he did not; and he represented that a builder's risk insurance policy had been purchased when, in fact, it had not)*. The Arbitration Award stated that the evidence presented supported "both a breach of contract cause of action and a DTPA cause of action against *Bella Vita*." Although the Plaintiffs-Creditors had cited in their "Statement of Claims" filed with the Arbitration Panel[5] more than a half-dozen specific provisions of the DTPA that Bella Vita and Defendant-Debtor allegedly violated,[6] the

---

[3] *See* Plaintiffs-Creditors' Second Amended Statement of Claims, pp. 7-23 [DE # 15 in the AP]. Note that references to "DE # __ in the AP" throughout these Findings of Fact and Conclusions of Law refers to the docket entry number at which a pleading appears in the docket maintained by the Bankruptcy Clerk in this Adversary Proceeding.

[4] *See* Plaintiffs-Creditors' Exhibit 12.

[5] *See* Plaintiffs-Creditors' Second Amended Statement of Claims, pp. 13-17 [DE # 15 in the AP].

[6] TEX. BUS. & COM. CODE ANN. §§ 17.46(b)(2), (3), (5), (7), (12), (13), (23) & 17.50(a)(2) & (3) (West 2017).

Arbitration Award did not state **which** specific provisions of the DTPA may have been violated. Then, the Arbitration Award went on to award "economic damages" for **DTPA violations** jointly and severally against **both Bella Vita and the Defendant/Debtor** in the amount of $677,053.50 (another $67,657.50 was added to this award for arbitration fees and expenses of the American Arbitration Association previously incurred by the Plaintiffs-Creditors, bringing the total of the award to $744,711). The Arbitration Award did not explain the basis for joint and several liability against both Bella Vita and the Defendant-Debtor. However, this court notes that, under the DTPA, a consumer may bring suit against any person whose false, misleading, or deceptive acts, or other practices enumerated in the Act are the producing cause of the consumer's harm.[7] The DTPA broadly defines "person" as "an individual, partnership, corporation, association, or other group, however organized."[8] The DTPA is a consumer protection statute, and according to the Texas Legislature, is to be construed liberally to promote its central purpose.[9] The Texas Supreme Court has stated that, if there is evidence that an agent of a separate legal entity **personally** made misrepresentations, then that agent can be held **personally liable** under the DTPA.[10] In fact, the Texas Supreme Court has concluded that when corporate officers make affirmative

---

[7] *Id.* at § 17.50(a)(1).

[8] *Id.* at § 17.45(3).

[9] *Id.* at § 17.44(a). *See Miller v. Keyser*, 90 S.W.3d 712, 715 & 719 (Tex. 2002) (in suit of home buyers against home builder and various of its agents personally, court noted that the purpose of the DTPA is not only to deter the conduct the DTPA forbids but also to provide consumers with an *efficient* means to redress deceptive business practices, citing TEX. BUS. & COM. CODE § 17.44(a), *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996), *Smith v. Baldwin*, 611 S.W.2d 611, 616 (Tex. 1980), *Pennington v. Singleton*, 606 S.W.2d 682, 690 (Tex. 1980), *Woods v. Littleton*, 554 S.W.2d 662, 670 (Tex. 1997)). *See also Eckman v. Centennial Sav. Bank*, 784 S.W.2d 672, 675 (Tex. 1990); *Jim Walter Homes, Inc. v. Valencia*, 690 S.W.2d 239, 242 (Tex. 1985); *Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 540 (Tex. 1981); *Joseph v. PPG Indus., Inc., 674* S.W.2d 862, 865 (Tex. App.—Austin 1984, writ ref'd n.r.e.).

[10] *Miller v. Keyser*, 90 S.W.3d at 717-18 (an agent may be held personally liable for his own violations of the DTPA regardless of his position in the company).

misrepresentations in connection with the sale of a home, the agents are personally liable under the DTPA even though they were acting on behalf of the corporation.[11] Liability attaches because *the officers themselves made the misrepresentations*.  In any event, the Arbitration Award stated that the "actions of Clem and Bella Vita do not constitute a knowing violation of the DTPA."[12] Further, the Arbitration Award went on to deny the Tomlinsons' claims for negligence and gross negligence as "barred by the economic loss rule."  The Arbitration Award also stated that the Tomlinsons' claims for "*misrepresentation, fraud*, fraud in the sale of real estate, conversion, estoppel, alter ego, and joint enterprise were *not sustained by a preponderance of the evidence and are, therefore, denied.*"[13]

**Stage Two: The Bankruptcy Case and Questions About the Preclusive Effect of the Tomlinsons' Arbitration Award.**  The Defendant-Debtor filed a Chapter 7 bankruptcy case on December 14, 2016.    Soon thereafter, the Plaintiffs-Creditors filed the above-referenced Adversary Proceeding.  On May 25, 2017, the Plaintiffs-Creditors filed an Amended Complaint in this Adversary Proceeding,[14] arguing, among other things, that the debt owed to the Plaintiffs-Creditors pursuant to the Arbitration Award is not dischargeable pursuant to 11 U.S.C. §

---

[11] *Weitzel v. Barnes*, 691 S.W.2d 598, 601 (Tex. 1985).

[12] *See* Plaintiffs-Creditors' Exhibit 12, ¶ 17.  "Knowing" violations of DTPA enable a plaintiff to obtain mental anguish damages. TEX. BUS. & COM. CODE ANN. § 17.50(b)(1) (West 2017).

[13] *See* Plaintiffs-Creditors' Exhibit 12, p.4 (emphasis added).

[14] The document was entitled "First Amended Objection to Discharge."  *See* DE # 12 in the AP.  The original complaint commencing this Adversary Proceeding was entitled "Objection to Discharge," filed April 3, 2017, and only alleged section 727 grounds for denial of the Debtor's overall discharge in his bankruptcy case.  *See* DE # 1 in the AP.  The First Amended Objection to Discharge alleged both grounds for denying the discharge of the Plaintiffs-Creditors' individual debt, pursuant to section 523(a)(2) of the Bankruptcy Code, as well as section 727 grounds for denial of overall discharge.  The Plaintiffs-Creditors announced at the beginning of the Trial that they were no longer pursuing their section 727 objection to overall discharge.  The court notes that the deadline for either section 523 or 727 objections in this case was June 19, 2017.  Thus, there was no timeliness issue with regard to the newly added section 523 objections asserted in the First Amended Objection to Discharge.

523(a)(2)(A), as the Defendant-Debtor allegedly made numerous false representations to the Plaintiffs-Creditors in connection with the Contract, on which Plaintiffs-Creditors relied to their detriment. These allegedly false representations included such things as: representing that the Defendant-Debtor's company was qualified to perform the work under the Contract; representing that the work would be performed in a good and workmanlike manner and in accordance with first-class custom home building practices; representing that the work would be in compliance with design plans; representing that a builder's risk insurance policy was in place on Plaintiffs-Creditors' project, and charging the Plaintiffs-Creditors for the same; representing that the Plaintiffs-Creditors' upfront payment of ten percent (10%) of the total Contract price would go only towards the Plaintiffs-Creditors' project; representing that a full-time superintendent and full-time project manager would be on the project, as well as a personal liaison to coordinate design selections; representing that subcontractors working on the Plaintiffs-Creditors' project were being paid; and representing that the Plaintiffs-Creditors would receive lien releases for work performed by subcontractors. The Plaintiffs-Creditors sought to have the full $744,711 Arbitration Award declared nondischargeable.

The Defendant-Debtor soon thereafter filed a "Motion for Summary Judgment Based on Res Judicata Affirmative Defense,"[15] arguing that the Plaintiffs'-Creditors' section 523(a)(2)(A) claims and issues were barred by "res judicata" because *fraud was asserted in the Prepetition Arbitration by the Plaintiffs-Creditors and such claims were denied in the Arbitration Award*. The Defendant-Debtor argued that res judicata precludes relitigation of claims fully adjudicated, or that arise out of the same subject matter and that could have been litigated in the prior action.[16]

---

[15] *See* DE # 15 in the AP.

[16] *Amstadt*, 919 S.W.2d at 652.

Additionally, for purposes of res judicata, the Defendant-Debtor argued that a judgment or decree confirming an arbitration award operates as a final judgment.[17]

_The Inapplicability of the Res Judicata Doctrine._   Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating claims that were or could have been raised in that action.[18]   Res judicata, of course, requires proof of the following elements:  (a) a prior final judgment on the merits by a court of competent jurisdiction; (b) identity of parties or those in privity with them; and (c) a second action based on the same claims as were raised or could have been raised in the first action.[19]   Preliminarily, this court agreed that, as a general matter, the res judicata doctrine is applicable to judgments or decrees confirming **arbitration awards**.[20]   However, it soon became clear that the Defendant-Debtor was arguing an inapplicable doctrine.  The United States Supreme Court, in _Brown v. Felsen,_ held that the doctrine of res judicata (_i.e.,_ claim preclusion) does **not** apply in bankruptcy dischargeability proceedings.[21]

In _Brown v. Felsen,_ a guarantor of the debtor's debt had obtained an agreed judgment against the debtor in a prepetition state court collection suit that had been brought by a lender

---

[17] The Plaintiffs-Creditors also filed a motion for summary judgment arguing that they were also entitled to judgment on their section 523(a)(2)(A) claim as a matter of law—based on the record from the Prepetition Arbitration.  _See_ DE ## 17-19 in the AP.  The court easily denied this motion—as the record certainly did not support an unrefuted finding of fraud.  The Plaintiffs-Creditors' motion for summary judgment is not addressed herein.  Rather, the much more vexing questions that were presented in the Defendant-Debtor's motion for summary judgment are addressed herein.

[18] _Cromwell v. County of Sac._, 94 U.S. 351, 352 (1876).

[19] _See Amstadt_, 919 S.W.2d at 652.  _See also Ellis v. Amex Life Ins. Co_., 211 F.3d 935, 937 (5th Cir. 2000).  Note that a federal court that is determining whether a judgment from a state court has res judicata effect should apply the law of the jurisdiction where the state court sits regarding the doctrine of res judicata.  _Del-Ray Battery Co. v. Douglas Battery Co._, 635 F.3d 725, 730 (5th Cir. 2011), _cert. denied_, 565 U.S. 1015 (2011).

[20] _See Milliken v. Grigson_, 986 F. Supp. 426, 431 (S.D. Tex. 1997), _aff'd_, 158 F.3d 583 (5th Cir. 1998); _J.J. Gregory Gourmet Servs., Inc. v. Antone's Import Co._, 927 S.W.2d 31, 33 (Tex. App.—Houston 1995, no writ); _Anzilotti v. Gene D. Liggin, Inc.,_ 899 S.W.2d 264, 266 (Tex. App.—Houston [14th Dist.] 1995, no writ) (citing _Bailey & Williams v. Westfall_, 727 S.W.2d 86, 90 (Tex. App.—Houston [14th Dist.] 1995, no writ)).

[21] _See Brown v. Felsen_, 442 U.S. 127, 133-39 (1979); _Key v. Wise_, 629 F.2d 1049, 1063-64 (5th Cir. 1980) (discussing _Brown v. Felsen_).

against both the debtor and guarantor. The agreed judgment did not specify the cause of action on which the agreed liability was based (contribution and indemnity? fraud? something else?). When the judgment debtor later filed bankruptcy, the guarantor sought to have the debt declared nondischargeable on the basis that the debtor had engaged in fraud, deceit, and malicious conversion in connection with underlying indebtedness that the guarantor had guaranteed. The bankruptcy court held that res judicata precluded the guarantor from relitigating the nature of the debt and from offering further evidence beyond that offered in the state court. The Supreme Court disagreed, holding that the bankruptcy court was not confined to a review of the judgment and record in the prior state-court proceedings when considering the dischargeability of respondent's debt. The Supreme Court first noted the general proposition that res judicata prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding and, thus, encourages reliance on judicial decisions, bars vexatious litigation, and frees the courts to resolve other disputes. But here, the litigants were not in the typical situation in which res judicata is raised—where a litigant might go into a new court and assert a new ground for recovery, nor was this the case of a litigant attacking the validity of a prior judgment. Rather, the guarantor was, essentially, attempting to meet the new "defense" of bankruptcy—which the debtor had interposed between the guarantor and the sum earlier determined to be due him. *In summary, Brown v. Felsen made clear that a creditor who obtains a prepetition judgment that is not based on fraud is not barred by res judicata from objecting to the dischargeability of his judgment, pursuant to section 523 (and, thus, from alleging fraud in the section 523 context).* Significantly, the Supreme Court noted that the *Brown v. Felsen* case concerned res judicata only, and not the narrower principle of

collateral estoppel.[22]  "Whereas res judicata forecloses all that which might have been litigated previously, collateral estoppel treats as final only those questions *actually and necessarily decided in a prior suit*. . . . If, in the course of adjudicating a state-law question, a state court should determine factual issues using *standards identical* to those of [predecessor to section 523], then collateral estoppel, in the absence of countervailing statutory policy, would bar relitigation of those issues in the bankruptcy court."

<u>*The Tougher Question of Applicability of the Collateral Estoppel Doctrine.*</u>  As with the doctrine of res judicata, case law holds that findings in an *arbitration award* can have collateral estoppel effects.[23]  The Fifth Circuit has stated, "if the first determination of an issue occurred in an arbitration which afforded litigants the 'basic elements of adjudicatory procedure,' a district court may find in a proper case that the arbitral award collaterally estops relitigation of the previously determined issues."[24]  Nevertheless, the application of collateral estoppel from arbitral findings is not required but is a matter within the broad discretion of the court.[25]

Twelve years after *Brown v. Felsen*, the Supreme Court elaborated upon what it had merely hinted at in *Brown v. Felsen*, regarding the possible applicability of collateral estoppel in nondischargeability proceedings, in the case of *Grogan v. Garner*.[26]  In *Grogan*, the Supreme Court primarily addressed the standard of proof in nondischargeability actions (*i.e.,* that it is

---

[22] *Brown*, 442 U.S. at 139, n. 10.

[23] *See Universal Am. Barge Corp. v. J-Chem, Inc.*, 946 F.2d 1131, 1136 (5th Cir. 1991) ("In an arbitral case not directly involving federal statutory or constitutional rights, courts should use a case-by-case approach to determining the collateral estoppel effects of arbitral findings."); *Viking Dynamics Ltd. v. O'Neill (In re O'Neill)*, 260 B.R. 122, 126-28 (Bankr. E.D. Tex. 2001) (finding that an arbitration award met the state and federal standards for collateral estoppel); *Pollock v. Marx (In re Marx)*, 171 B.R. 218, 221-22 (Bankr. N.D. Tex. 1994) (same).

[24] *Universal Am. Barge*, 946 F.2d at 1137.

[25] *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 331 (1979); *Universal Am. Barge,* 946 F.2d at 1137.

[26] *Grogan v. Garner*, 498 U.S. 279, 284 n.11 (1991).

preponderance of the evidence and not clear and convincing evidence). However, the Court also stated that, while it had "suggested" in *Brown v. Felsen* that principles of **collateral estoppel** (in contrast to res judicata) may apply in dischargeability actions, it was now officially clarifying that collateral estoppel (issue preclusion) can indeed prevent a bankruptcy court from determining dischargeability issues itself.[27] Specifically, the Court noted that, if a creditor obtains a prepetition fraud judgment, its claim will be exempt from discharge under collateral estoppel principles if the elements of the fraud claim that resulted in the judgment are the same as those of the fraud discharge exception.

It should be noted, as a general principle, that, to determine whether a prior judicial fact finding from a state court or tribunal should be given collateral estoppel effect, a federal court must look to state law to determine the collateral estoppel effect (same as with res judicata).[28] Under Texas law, a party seeking to invoke the doctrine of collateral estoppel must establish: (1) the facts sought to be litigated in the second action were fully and fairly litigated in the prior action, (2) those facts were essential to the judgment in the first action, and (3) the parties were cast as adversaries in the first action.[29] This is similar to the Fifth Circuit's requirements for application of collateral estoppel, which are: (1) that the issue under consideration is identical to the issue previously litigated, (2) that the issue was fully and vigorously litigated in the primary proceeding,

---

[27] *Id.*

[28] *Marrese v. Am. Academy of Orthopedic Surgeons*, 470 U.S. 373, 373-74 (1985); *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 87-88 (1984); *Ragupathi v. Bairrington (In re Bairrington)*, 183 B.R. 754, 756-57 (Bankr. W.D. Tex. 1995); *Kleindienst v. Horne (In re Horne)*, Adv. No. 10-5063-C, 2011 WL 350473, at *4-6 (Bankr. W.D. Tex. Feb. 2, 2011).

[29] *Pancake v. Reliance Ins. Co. (In re Pancake)*, 106 F.3d 1242, 1244 (5th Cir. 1997).

(3) that the previous determination of the issue was necessary for the judgment in that proceeding, and (4) that no special circumstances exist that would render preclusion inappropriate or unfair.[30]

The Fifth Circuit elaborated upon the applicability of the doctrine of collateral estoppel in dischargeablity actions significantly in the case of *Dennis v. Dennis*.[31] In *Dennis*, a plastic surgeon filed bankruptcy, and his ex-wife sought to have excepted from discharge a debt owing to her, alleging that it was in the nature of "alimony, maintenance, or support" (pursuant to section 523(a)(5) of the Bankruptcy Code, as it was worded at the time of the *Dennis* bankruptcy).[32] The debt was an obligation of the husband-debtor to pay taxes on the ex-wife's share of retirement benefits awarded to her in their long-resolved divorce case. During the divorce case, the parties had agreed that the husband-debtor would pay the taxes—and apparently it was characterized therein as part of the ***division of community property*** and not any form of "spousal support, alimony, or child support." Later, the husband-debtor breached his agreement to pay the taxes and the IRS pursued the ex-wife for the taxes owed. Then the ex-wife filed a new state court lawsuit against the husband-debtor for breach of the divorce agreement, and she characterized this obligation of the husband-debtor to pay the taxes as part of a ***division of community property***. The state court entered an agreed judgment holding that the husband-debtor was liable for the taxes and, in doing so, referred to the language in the divorce decree stating that the obligation was part of the community property division and not any form of "spousal support, alimony or child support."[33] Days later, the husband-debtor filed bankruptcy. He contended that, because the

---

[30] *Universal Am. Barge Corp.*, 946 F.2d at 1136.

[31] *Dennis v. Dennis (In re Dennis),* 25 F.3d 274, 278 (5th Cir. 1994), *cert. denied*, 513 U.S. 1081 (1995).

[32] Now all "domestic support obligations" (whether or not in the nature of "alimony, maintenance, or support") are excepted from discharge pursuant to section 523(a)(5) of the Bankruptcy Code—and such term is broadly defined in section 101(14A) of the Bankruptcy Code.

[33] *Dennis*, 25 F.3d at 277.

divorce court and subsequent state court had found that the obligation to the ex-wife did not

constitute alimony or spousal support, the doctrine of collateral estoppel precluded the bankruptcy

court from finding to the contrary and excepting the obligation from discharge under section

523(a)(5) of the Bankruptcy Code.  The bankruptcy court disagreed and so did the Fifth Circuit.

The Fifth Circuit stated that the determination of whether a debt is dischargeable is a matter of

*federal bankruptcy law*, not state law,[34] adding that bankruptcy courts must look **beyond the labels**

which state courts—and even parties themselves—give obligations which debtors seek to have

discharged.  The Fifth Circuit stated that the reason for this is that parties and state courts, as a

general rule, do not label obligations with federal bankruptcy standards in mind and that, even if a

state court reviews an issue which is similar to one created by the nondischargeability provision in

the Bankruptcy Code, the state-law concept will likely differ from the specific federal bankruptcy

doctrine in question.[35]  The court further stated:

> Hence, in only limited circumstances may bankruptcy courts defer to the doctrine
> of collateral estoppel and thereby ignore Congress' mandate to provide plenary
> review of dischargeability issues.  Collateral estoppel applies in bankruptcy courts
> only if, inter alia, the first court has made specific, subordinate, factual findings on
> the identical dischargeability issue in question-that is, an issue which encompasses
> the same prima facie elements as the bankruptcy issue-and the facts supporting the
> court's findings are discernible from that court's record. *In re Davis*, 3 F.3d 113,
> 115 (5th Cir.1993); *In re Shuler*, 722 F.2d at 1256. *See In re Comer*, 723 F.2d 737
> (9th Cir.1984) (ruling that bankruptcy courts should not rely solely on state court
> judgments when determining the true nature of a debt for dischargeability purposes
> if so doing would prevent the bankruptcy courts from exercising their exclusive
> jurisdiction to determine whether the debt is dischargeable); *see also Browning v.
> Navarro*, 887 F.2d 553, 561 (5th Cir.1989) (providing that although the doctrine of
> res judicata is generally applicable to bankruptcy courts, the contours of the
> doctrine are "different for bankruptcy courts . . . because tasks which have been
> delegated to [bankruptcy courts] by Congress may not be interfered with by the

---

[34] *Id.*

[35] *Id.*

decisions of other courts . . . .[B]ankruptcy courts have a job to do and sometimes they must ignore res judicata in order to carry out Congress' mandate").[36]

After applying this law, the Fifth Circuit held that the bankruptcy court was not precluded from going behind the state court and making its own finding, in the nondischargeability context, and that the bankruptcy court did not err in determining that the obligation of the debtor-husband to the ex-wife was in the nature of support (not a community property division) and was therefore nondischargeable under section 523(a)(5) of the Bankruptcy Code.

The Fifth Circuit has reiterated multiple times that issue preclusion will only prevent a bankruptcy court from determining dischargeability issues for itself if "***the first court has made specific, subordinate, factual findings on the identical dischargeability issue in question . . . and the facts supporting the court's findings are discernible from that court's record***."[37]  The party asserting issue preclusion bears the burden of proof and has the burden of bringing forward an adequate state-court record."[38]

The Fifth Circuit case of *King* is further instructive on these issues.  In *King*, the plaintiffs in a nondischargeability action had obtained a state court judgment and the issue before the Fifth Circuit was whether its terms precluded the plaintiffs' section 523(a)(2)(A) claim.  The details were that a jury had first returned a verdict that the debtor breached a contract with the plaintiffs and also committed fraud against them.  Initially the state court rendered a judgment consistent with the jury's verdict.  Then, in response to a motion for new trial, the trial judge substituted a new judgment that limited the plaintiffs' award to only contract damages.  The state court judgment

---

[36] *Id.*

[37] *Fielder v. King (In re King),* 103 F.3d 17, 19 (5th Cir. 1997) (emphasis added); *Dennis*, 25 F.3d at 278.

[38] *King,* 103 F.3d at 19.

did not indicate the reason why the trial judge eliminated the plaintiffs' fraud damages. When the debtor later filed bankruptcy and the plaintiffs brought a nondischargeability action alleging fraud, the bankruptcy court granted the debtor's motion to dismiss based on principles of preclusion. The bankruptcy court noted that the state court's decision to substitute a new judgment reflecting that the plaintiffs' claims only sounded in contract, rather than fraud, was made for reasons "only known to the state court judge" but preclusion nevertheless applied.[39] The Fifth Circuit disagreed and overturned this decision. The Fifth Circuit quoted its earlier decision in *Dennis* as holding that "issue preclusion will prevent a bankruptcy court from determining dischargeability issues for itself only if 'the first court has made specific, subordinate, factual findings on the identical dischargeability issue in question . . . and the facts supporting the court's findings are discernible from the record.'"[40] The Fifth Circuit stated that the state court record presented did not meet the requirements of *Dennis*. While noting that a full state-court record will not always be required for a bankruptcy court to apply issue preclusion, the record still must provide a sufficient basis for the bankruptcy court to determine that the issue to be decided was "actually litigated and necessarily decided" in the state court.[41] The Fifth Circuit believed that the record presented to it from the state court reflected no "'specific, subordinate, factual finding' that [debtor's] debt to the [plaintiffs] was not obtained by false pretenses, false representations, or actual fraud. Moreover, the record is devoid of facts to support such a finding, even if such a finding had been made."[42] While the debtor had urged that it was implicit in the state court's action in issuing a substituted

---

[39] *Id.* at 20.

[40] *Id.* at 19 (citing *Dennis* 25 F.3d at 278).

[41] *Id*. at n.1.

[42] *Id*. at 19.

judgment that debtor did ***not*** obtain the debt by false pretenses, false representations, or actual fraud, the Fifth Circuit stated that the "bare fact that the state court awarded only contract rather than fraud damages does not preclude the bankruptcy court from inquiring into the true nature of that debt."[43] The Fifth Circuit went on to state that there were any number of reasons that the state court may have altered the judgment award. It further stated that, "We have admonished bankruptcy courts to 'look beyond labels which state courts . . . give obligations which debtors seek to have discharged. . . . The fact that a state court labels a judgment 'contract damages' rather than 'fraud damages' does not control the bankruptcy court if the state court's determination did not necessarily include a finding regarding the dischargeability issue (*i.e.,* whether the debt was obtained by false pretenses, a false representation, or actual fraud).'"[44] The Fifth Circuit reiterated in a footnote that the plaintiffs "need not have recovered a state-law fraud verdict in order to prevail on a claim that the debt owed them was obtained by fraudulent behavior and consequently should be discharged."[45]

In exercising this court's "broad discretion" as to whether to apply collateral estoppel to the arbitral findings in the case at bar,[46] the court concluded that it should ***not*** and ***denied*** the Defendant-Debtor's motion for summary judgment. First, this court was ever-mindful of the

---

[43] *Id.*

[44] *Id.*

[45] *Id.* at n.3 (citing *Brown*). *But see RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284 (5th Cir. 1995), *overruled on other grounds by Husky Intern., Elecs., Inc. v. Ritz,* 136 S.Ct. 1581 (2016) (RTC had filed federal district court lawsuit against a doctor-debtor and other borrowers, asserting breach of contract, conspiracy to defraud, common law fraud, and unjust enrichment; RTC abandoned the common law fraud and unjust enrichment counts, and a jury came back with a verdict of breach of contract against doctor-debtor and the other defendants, but only found conspiracy to defraud against all defendants ***except*** doctor-debtor; Fifth Circuit held that, in later dischargeability action, jury's verdict precluded a dischargeability determination by the court because the identical issue of "conspiracy to defraud" was what was "actually litigated" before the jury and was subsequently argued as the section 523(a) grounds).

[46] *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 331 (1979); *Universal Am. Barge,* 946 F.2d at 1137.

admonishments of the Fifth Circuit that only in "limited circumstances may bankruptcy courts defer to the doctrine of collateral estoppel and thereby ignore Congress' mandate to provide plenary review of dischargeability issues."[47] Moreover, this court did not have a discernible record from the Prepetition Arbitration proceedings to conclude that the Arbitration Panel "***made specific, subordinate, factual findings on the identical dischargeability issue in question.***"[48] In fact, the record presented to the bankruptcy court was utterly devoid of any facts that may have been fully and fairly litigated so as to make the Arbitration Panel declare DTPA violations, but no common law fraud claims. While the Arbitration Award noted various false statements having been made by Defendant-Debtor,[49] the Arbitration Award went on to state that the "claims of the [Plaintiffs-Creditors] for misrepresentation, fraud, fraud in the sale of real estate, conversion, estoppel, alter ego, and joint enterprise were not sustained by a preponderance of the evidence and are, therefore, denied." But then the Arbitration Award goes on to state that the evidence supports "a DTPA cause of action" and the economic damages awarded "are addressed as DTPA violations against both Bella Vita and Clem."[50] The Arbitration Award never stated ***what*** provisions of the DTPA were determined to have been violated—something such as "breach of an express or implied warranty"[51] or something more close to section 523(a)(2)(A) such as a "false, misleading, or deceptive act"?[52] This court had no way of knowing what exact acts were determined to have

---

[47] *Dennis*, 25 F.3d at 277.

[48] *King,* 103 F.3d at 19 (emphasis added). *See also Dennis*, 25 F.3d at 278.

[49] *See* Plaintiffs-Creditors' Exhibit 12, ¶¶ 12 & 5.

[50] *Id*. at ¶ 20.

[51] TEX. BUS. & COM. CODE ANN. § 17.50(a)(2) (West 2017).

[52] TEX. BUS. & COM. CODE ANN. § 17.46(a)-(b) (West 2017).

given rise to a DTPA violation and what standards were applied by the Arbitration Panel. For collateral estoppel purposes, issues are not identical if a second lawsuit "involves application of a different legal standard, even though the factual setting of both suits be the same."[53]

One problem with arbitration proceedings generally is that they are not courts of record. This is perhaps why courts of appeal have opined that courts have broad discretion in determining whether to give arbitral findings collateral estoppel effect.[54] But most troubling, what if creditors such as the Plaintiffs-Creditors here, choose ***not*** to put on full evidence of fraud when they see that they can easily make a case under the more consumer-friendly statute of DTPA? They might not really have the incentive to pursue the more difficult-to-prove fraud claims.[55] A DTPA claim does not require that the consumer prove the employee acted knowingly or intentionally.[56] A consumer is not required to prove intent to make a misrepresentation to recover under the DTPA.[57] The DTPA was enacted to "protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty"[58] and to provide consumers with a means to redress deceptive practices "without the burden of proof and numerous defenses

---

[53] *RecoverEdge*, 44 F.3d at 1291 (and citations therein).

[54] This court hastens to add that failure to introduce a trial record from earlier court proceedings does not absolutely bar the use of issue preclusion. *Sheerin v. Davis (In re Davis)*, 3 F.3d 113, 115 (5th Cir. 1993). However, the record supporting a state court judgment must be sufficiently detailed in order for a bankruptcy court to be able to give it collateral estoppel effect on an identical issue.

[55] The DTPA simply requires that the consumer show that a misrepresentation was false and that the false misrepresentation was the producing cause of the consumer's damages. TEX. BUS. & COM. CODE ANN. § 17.50(a) (West 2017). *See also Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 502 (Tex. 2001).

[56] *Id.* at 502. *See also Eagle Props., Ltd. v. Scharbauer*, 807 S.W.2d 714, 724 (Tex. 1990); *Smith v. Baldwin*, 611 S.W.2d 611, 616-17 (Tex. 1980).

[57] *Id.* at 616-17.

[58] TEX. BUS. & COM. CODE ANN. § 17.44(a) (West 2017). *See also Amstadt*, 919 S.W.2d at 649.

encountered in a common law fraud or breach of warranty suit."[59] Misrepresentations that may not be actionable under common law fraud may be actionable under the DTPA.[60] Is it fair or appropriate—in a situation like this—to preclude creditors from pursuing section 523 allegations, in the new venue of bankruptcy court, simply because they may have *only* prevailed on DTPA (and breach of contract) claims in prepetition litigation/arbitration? This court thinks not.[61] For collateral estoppel to be applied, an issue must have been "***fully and fairly litigated***" in the previous proceeding. While the Arbitration Award states that the "claims of the [Plaintiffs-Creditors] for misrepresentation, fraud, fraud in the sale of real estate, [etc.] . . . were not sustained by a preponderance of the evidence and are, therefore, denied," we really have no evidence in the arbitration record that the Plaintiffs-Creditors fully and vigorously litigated common law fraud claims.[62] After all, the Plaintiffs-Creditors were not facing a "defense" of bankruptcy at that time.[63]

   In summary, this court denied both parties' motions for summary judgment[64] and set the Adversary Proceeding for Trial.

---

[59] *Baldwin*, 611 S.W.2d at 616. *See also Pennington v. Singleton*, 606 S.W.2d 682, 690 (Tex. 1980); *Woods v. Littleton*, 554 S.W.2d 662, 670 (Tex. 1977).

[60] *Eagle Props., Ltd.*, 807 S.W.2d at 724; *Baldwin*, 611 S.W.2d at 616.

[61] *See Brown*, 442 U.S. at 133-39 (discussing the fact that a nondischargeability action is akin to a new "bankruptcy defense" that a state-law plaintiff/creditor was not yet facing).

[62] For other examples of cases in which bankruptcy courts have struggled with application of collateral estoppel in section 523 litigation, where prior DTPA litigation was involved, see the following: *Dang v. Gilbert (In re Dang)*, 560 B.R. 287 (S.D. Tex. 2016); *Ragupathi v. Bairrington (In re Bairrington)*, 183 B.R. 754 (Bankr. W.D. Tex. 1995); *Kleindienst v. Horne (In re Horne)*, Adv. No. 10-5063-C, 2011 WL 350473, at *4 (Bankr. W.D. Tex. Feb. 2, 2011).

[63] *See Brown*, 442 U.S. at 133-39.

[64] As mentioned earlier, the Plaintiffs-Creditors also filed a motion for summary judgment arguing that it was also entitled to judgment on its section 523(a)(2)(A) claim as a matter of law—based on the record from the Prepetition Arbitration. *See* DE ## 17-19 in the AP. The court easily denied this motion—as the record did not support an unrefuted finding of fraud.

**Stage Three:  The Big Reveal; Bella Vita Had Some Insurance Coverage.**  Soon after the motions for summary judgment were denied, the court set this Adversary Proceeding for an evidentiary Trial.[65]  Something troubling and unexpected happened midway through the first day of Trial.   Specifically, on the first day of Trial during the Defendant-Debtor's counsel's examination of the Defendant-Debtor himself, counsel began questioning the Defendant-Debtor regarding the topic of insurance.  The Defendant-Debtor's counsel asked the Defendant-Debtor whether Bella Vita had a commercial general liability insurance policy in place during the time of the construction of the Tomlinsons' Home, to which the Defendant-Debtor answered "yes."[66] Soon thereafter, Defendant-Debtor's counsel pulled out a Def. Exh. 5, which was a 14-page document entitled "Summary of Insurance Bound," dated April 9, 2015, for Bella Vita Custom Homes, LLC, prepared by a Wortham Insurance Company (indicating at the bottom that it was a "Proposal" and "only a general description of coverages provided").[67]  The document appeared to be a proposal to provide general liability as well as an excess umbrella policy for Bella Vita, through Mid-Continent Casualty Company, for the year April 10, 2015-December 31, 2015 (the time frame that the Contract and the various mishaps thereunder occurred).  The Defendant-Debtor also pulled out a Def. Exh. 4, which appeared to be a Declaration for Commercial Insurance for Bella Vita, through Mid-Continent Casualty Company, for December 31, 2015 through December 31, 2016.   Plaintiffs-Creditors' counsel immediately objected to the introduction of these documents, informing the court that this was the first that he and his clients had ever heard about any insurance that Bella Vita may have had, despite inquiries in the past about insurance.

---

[65] The first day of Trial began August 23, 2017.

[66] *See* Transcript, p. 70 (lines 9-11).  References to the "Transcript, p. _" herein refer to the Transcript of the first day of the Trial held on August 23, 2017 and is located at DE # 59 in the AP.

[67] *See* Defendant-Debtor's Exhibit 5.

To put this into full context, one of the many assertions of "false representations" that the Tomlinsons have asserted against Bella Vita and the Defendant-Debtor in this Adversary Proceeding is that they knowingly and falsely represented that both builder's risk and general liability insurance policies "would be purchased for the construction of the [Tomlinsons'] home"; that Bella Vita "did not obtain any insurance policies"; and that, as a result, the Tomlinsons were "unable to collect their judgment from" Bella Vita or the Defendant-Debtor.[68]   The Tomlinsons had also more specifically complained that Bella Vita and the Defendant-Debtor had falsely represented or implied in written accounting reports supplied to the Tomlinsons that a builder's risk policy was in place[69]   (which, in fact, was never acquired) and the Tomlinsons had been charged $22,415.93 for the same.[70]   The Contract at paragraph 9.J provided as follows:

> Builder shall provide and maintain at all times, Builder's Risk Insurance as protection against fire, storm, theft or vandalism during the course of construction of the Home in an amount equal to or greater than the Contract Sales Price.  Builder shall include Owner as additional insured.[71]

This requirement of a Builder's Risk Insurance policy was reiterated at paragraph 19 of the Contract with slightly broader terms as to what needed to be covered—*i.e.,* insurance to cover the cost of construction of the house in the event of "destruction of the improvements by fire, earthquake, explosion, hail, windstorm, or ***any other casualty*** prior to completion and Owner's occupancy.[72]  In addition, paragraph 9.J of the Contract stated:

---

[68] *See* Joint Pre-Trial Order, p. 6 [DE # 40 in the AP], filed August 22, 2017.

[69] *See* Tomlinson's First Amended Objection to Discharge and Dischargeability, p. 6 (¶ 13f) [DE # 12 in the AP], filed May 25, 2017.

[70] *See* Plaintiffs-Creditors' Exhibit 5 (p. 0000050), provided June 4, 2017 to Mrs. Tomlinson; Defendant-Debtor's Exhibit 6; & Plaintiffs-Creditors' Exhibit. 13.109 (p. 000031).

[71] *See* Plaintiffs-Creditors' Exhibit 1.

[72] *Id.* (emphasis added).

> Builder shall, at its own expense, during the entire period of Work, carry . . . commercial general liability insurance (***including contractual liability coverage***) necessary for the full protection of Builder and Owner from injury to persons or property arising from the acts of the Builder or its subcontractors during the progress of the Work with limits of at least $1,000,000 per occurrence.[73]

Such paragraph went on to provide that "Certificates of insurance shall be delivered to Owner . . . prior to the Initial Closing Date [not a defined term] and that each policy shall provide "for Owner to be named as an additional insured on the commercial general liability insurance policy."[74]

To be clear, both the Contract and the Plaintiffs-Creditors, in this Adversary Proceeding, made the topic of insurance a ***very*** significant issue.  It was not just that it appeared that the Tomlinsons had been charged for a builder's risk policy that had never been purchased for their Home, but the Tomlinsons started Trial believing there was apparently no insurance of any kind to potentially cover their contractual and property damage claims (such as the significant water damage that ended up occurring).  And the Plaintiffs-Creditors and their counsel had good reason to believe that there was no insurance.  Why?  The Plaintiffs-Creditors' counsel had served written discovery on Bella Vita and the Defendant-Debtor prepetition, inquiring about the topic of insurance.[75]  In an Objections and Responses to the Plaintiffs-Creditors' First Requests for Production, served on the Plaintiffs-Creditors on May 4, 2016, Bella Vita and the Defendant-Debtor answered as follows in connection with questions pertaining to insurance policies:

> **REQUEST FOR PRODUCTION NO. 3**
> To identify and produce a copy of any and all insurance policies, certificates of insurance, declaration pages and contracts that relate to insurance, worker's compensation insurance that relate to this lawsuit and any document or memorandum evidencing the existence of insurance in effect on the date of the occurrence made the basis of this lawsuit.

---

[73] *Id.* (emphasis added).

[74] *Id.*

[75] *See* Plaintiffs-Creditors' Exhibit. 11.

**RESPONSE:**

Respondent objects to this Request because it and the other 178 Requests propounded by Claimants are unduly burdensome, are not proportional to the needs of the case, and were served solely for the purpose of harassment. Respondent objects to this Request because it is overbroad, harassing, not reasonably limited in time or scope, and not reasonably calculated to lead to discoverable evidence. Respondent further objects to this Request because it seeks information and documents that are irrelevant to the claims and defenses to this lawsuit. ***Subject to and without waiving the foregoing objections, Respondent identified no responsive documents***.[76]

**REQUEST FOR PRODUCTION NO. 4**

To identify and produce any and all excess or umbrella insurance policies or documents or memorandum evidencing the existence of insurance in effect on the date of the occurrence made the basis of this lawsuit.

**RESPONSE:**

Respondent objects to this Request because it and the other 178 Requests propounded by Claimants are unduly burdensome, are not proportional to the needs of the case, and were served solely for the purpose of harassment. Respondent objects to this Request as vague and confusing insofar as it seeks documents and information "in effect on the date of the occurrence [that] made the basis of this lawsuit" because there is not one occurrence that made the basis of this lawsuit and this Request fails to identify the information sought with reasonable particularity. Respondent further objects to this Request because it is overbroad, unduly burdensome, harassing, not reasonably limited in time or scope, and not reasonably calculated to lead to discoverable evidence. Respondent further objects to this Request because it seeks information and documents that are irrelevant to the claims and defenses to this lawsuit. ***Subject to and without waiving the foregoing objections, Respondent identified no responsive documents.***[77]

In addition to Requests for Production 3 and 4 set forth above, there were four other Requests for Production aimed at obtaining information regarding insurance coverage.[78]  Bella Vita and the Defendant-Debtor responded in all cases that there were "no responsive documents."

---

[76] *Id.* (emphasis added).

[77] *Id.* (emphasis added).

[78] *Id.* (Request Nos. 6, 7, 8, and 9).

When the Defendant-Debtor attempted to introduce evidence that Bella Vita had commercial liability and excess umbrella liability insurance policies, as required by the Contract, on the first day of Trial, the Plaintiffs-Creditors' counsel immediately pulled out these discovery responses and objected—crying foul that the Defendant-Debtor had never before disclosed them. The Defendant-Debtor and his counsel reacted with all sorts of plausible deniability. First, the Defendant-Debtor stated that he thought that insurance policies had, in fact, been produced in prior depositions handled by his prior lawyers at the law firm of Bell Nunnally.[79] There was no evidence that this was true. The Defendant-Debtor's **counsel** further added that the written discovery responses cited above had been prepared by the Defendant-Debtor's previous lawyers at Bell Nunnally (who were not retained in this Adversary Proceeding). And the Defendant-Debtor's current counsel was quick to reiterate that he had only learned about the insurance in the last few days.[80] Later in the day, the Defendant-Debtor's father, Mike Clem, who was an equity owner and Chief Financial Officer of Bella Vita, testified about the incorrect written discovery responses. He suggested that he was the one who likely dealt with Bella Vita's prior lawyers in responding to this written discovery concerning insurance, and he probably had "tunnel vision" and thought the questions were aimed at insurance specifically dealing with the Tomlinsons' Home, such as an individual builder's risk policy, which was, in fact, never purchased for the Tomlinsons' Home— allegedly since Bella Vita never bought builders' risk insurance policies until home projects went vertical.[81] On balance, the combined statements of the Defendant-Debtor, his current lawyer, and Mike Clem were not very convincing.

---

[79] *See* Transcript, pp. 73-74.

[80] *See* Transcript, pp. 75-84; 90-91.

[81] *See* Transcript, pp. 242-49, 280-86.

Moreover, the court expressed that the Defendant-Debtor and his counsel could not skirt the issue by simply blaming the prepetition nondisclosure of insurance on the Defendant-Debtor's prior counsel—because the nondisclosure had persisted ***post***petition. Rule 26(a) of the Federal Rules of Civil Procedure applies in this Adversary Proceeding. It states that:

> (a) **Required Disclosures**.
> (1) **Initial Disclosure.**
>> (A) *In General*. Except as exempted by Rule 26(a)(1)(B) [not applicable] or as otherwise stipulated or ordered by the court, a party must without awaiting a discovery request, provide to the other parties: . . . **(iv)** for inspection and copying as under Rule 34, ***any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment*** (emphasis added).[82]

It is clear from the record that the parties and counsel never stipulated (and this court never ordered) that this provision of Rule 26(a) would not apply. In this Adversary Proceeding (as with all adversary proceedings in this District), an "Order Regarding Adversary Proceedings Trial Setting and Alternative Scheduling Order" (hereinafter, the "Alternative Scheduling Order") was issued immediately following the filing of the Adversary Proceeding.[83] It provided as follows: "Unless otherwise ordered by the Court, the disclosures required by Federal Bankruptcy Rule 7026(a) shall be made within fourteen (14) days of the entry of a scheduling order, including the Alternative Scheduling Order contained in Part III below (which shall become effective on the forty-sixth day following entry of this Order)."[84] The Alternative Scheduling Order also provided that exhibits that might be used at trial, except for impeachment, were required to be exchanged with opposing counsel "fourteen (14) days prior to Docket Call" (along with a filed exhibit list).[85]

---

[82] FED. R. CIV. P. 26.

[83] *See* DE # 4 in the AP, dated April 4, 2017.

[84] *Id.* at ¶ 1.

[85] *Id.* at ¶ 3.

A few weeks later, the parties submitted a "Joint Discovery Plan."[86] The Joint Discovery Plan stated that, among other things, "the parties agreed that initial disclosures would be exchanged on or before Wednesday May 24, 2017."[87] The Joint Discovery Plan also stated that the "parties have consented to the terms of the Alternative Scheduling Order contained within ECF Doc 4 and agree that the same shall control all deadlines in this case, unless an agreement stating otherwise is entered into between the parties."[88]

So, in summary, Rule 26(a), the Alternative Scheduling Order and the Joint Discovery Plan collectively required that all insurance policies that might be applicable to the claims in this Adversary Proceeding had to be exchanged with the Tomlinsons by May 24, 2017. This did not happen. Moreover, exhibits that might be used at trial had to be exchanged 14 days prior to the August 2017 trial docket call. This did not happen. The Witness and Exhibit List timely filed by the Defendant-Debtor on July 31, 2017 [89] disclosed no insurance policies on the list of exhibits that might be introduced at Trial. The court takes judicial notice that, in the Bella Vita bankruptcy case, the Schedules, at Question 73, which inquires as to whether the debtor has "Interests in insurance policies or annuities" the Debtor listed no information.[90] The Bella Vita Schedules were amended once to add further information, but Question 73 was not changed.[91]

---

[86] *See* DE # 11 in the AP, filed May 24, 2017.

[87] *Id.* at Part II.

[88] *Id.* at Part III.

[89] *See* DE # 28 in the AP.

[90] *See* DE # 16, Schedule B in *In re Bella Vita Custom Homes, LLC* (Case No. 16-34790-bjh-7).

[91] *See* DE # 44, Schedule B in *In re Bella Vita Custom Homes, LLC* (Case No. 16-34790-bjh-7).

After this all came out the first day of Trial, the court pressed further for information on why the insurance policies that Bella Vita did have apparently had never been disclosed to the Tomlinsons or their counsel until now.  Besides the explanations earlier mentioned, the Defendant-Debtor suggested that he did not think it really mattered—as far as he knew commercial general liability insurance would not cover any of the Tomlinsons' damages.[92]  When further pressed, the Defendant-Debtor's counsel stated that he had never really realized until recently that the Tomlinsons were complaining that not only builders risk insurance but also commercial liability insurance had not existed, and he asked his client and had literally received copies of the commercial liability policies the day before the Trial started.[93]

The court ultimately adjourned and continued the Trial two months to October 11, 2017, to allow the parties time to investigate the scope of the insurance policies.  The court also later held a status conference with the Chapter 7 bankruptcy trustees of both the Defendant-Debtor and Bella Vita bankruptcy estates—to make sure they knew there was insurance that may or may not cover the Tomlinsons' and other creditors' claims.  The court expressed that the false statements in the past concerning the insurance—and failure to comply with Rule 26(a) and orders of this court—might impact the damages in this Adversary Proceeding.  Not only does the court's Alternative Scheduling Order provide that sanctions may be imposed for failure to comply with it (such as shifting of attorney's fees), but the court was concerned that this failure to disclose might suggest a troubling pattern or history of concealment on the part of the Defendant-Debtor that could not merely be passed off to attorneys.

---

[92] *See* Transcript, pp. 71-74.

[93] *Id.* at p. 90.

**Stage Four: The Second Day of Trial in the Section 523 Adversary Proceeding.**

After a bankruptcy case status conference was held on September 29, 2017, to address with the bankruptcy trustees the insurance policies—and the prospect that such policies might provide coverage for some of the Tomlinsons' claims and the claims of others who had problems with their homes that Bella Vita had contracted to build—the court resumed the Trial in this matter on October 11, 2017.  To be clear, the sole scope of this second day of Trial would be to hear evidence regarding Bella Vita's insurance policies that had never—in almost two years of litigation with the Tomlinsons—been disclosed to them.  On October 11, 2017, the Defendant-Debtor continued with his theme of plausible deniability on the subject of the nondisclosure of the insurance.  While his deniability at times seemed potentially plausible, the court was not convinced that the Defendant-Debtor was being wholly candid on the subject.

At the beginning of the second day of Trial, the court received evidence that reflected that, as early as January 2016, the Tomlinsons' legal counsel was asking Bella Vita's and the Defendant-Debtor's legal counsel (the Bell Nunnally law firm) for a list of Bella Vita's insurance policies, and Bell Nunnally was passing along this and other requests by email to the Defendant-Debtor and his father, Mike Clem.[94]  But no insurance information was ever passed along to the Tomlinsons' counsel, and the Defendant-Debtor continued to have no explanation for that—he said that, although he was copied on the emails from Bell Nunnally requesting a list of insurance policies, he did not remember paying attention to the emails and that he would have assumed that others in the company including his father would be handling that.  The Defendant-Debtor also testified that, as to the May 2016 Requests for Production from the Tomlinsons,[95] he did not "fill out" the

---

[94] *See* Defendant-Debtor's Exhibit 13.

[95] *See* Plaintiffs-Creditors' Exhibit 11.

answers to them wherein it was stated that Bella Vita had identified no insurance.[96]  He later said that he had not seen the Requests for Production.[97]  The Defendant-Debtor further stated that he really did not understand that insurance was something the Tomlinsons were trying to get—he did not think it seemed to be a "focal point" for them[98]  He said he did not believe their claims were an "insurable deal."[99]  The Tomlinsons' counsel reminded the Defendant-Debtor that there was massive damage to the Tomlinsons' foundation due to flooding after Bella Vita (or its subcontractors) punctured a water main and questioned why Defendant-Debtor would not wonder if insurance might pay for some of that (the court notes that some $235,000 of the Arbitration Award was for repairs needed to the Home's building pad after the flooding).  The Defendant-Debtor did not have much of an answer on this question—other than to say he received a cease-and-desist letter shortly after the water-puncturing incident and was required to leave the property; thus, he really was not sure how bad the damage turned out to be.  He further testified that his prior lawyers at  Bell Nunnally—that were representing him during the Tomlinsons' requests to get information concerning insurance—withdrew from representing him for nonpayment of their legal bills in the "middle of the discovery process" and "didn't make it to the arbitration."[100]

The court also heard reports that the Tomlinsons' lawyer has now made a claim on Bella Vita's insurance but, as of the second day of Trial, had not heard back regarding whether coverage will be granted.  The court conducted a follow up status conference on December 18, 2017.  At

---

[96] 10/11/17 FTR audio at 10:01:45.

[97] *Id.* at 10:20:07.

[98] *Id.* at 10:09:34.

[99] *Id.* at 10:09:43.

[100] *Id.* at 10:14:08.

that hearing, it was reported that the insurance company had subsequently responded with three reasons for denial of coverage on any of the Tomlinsons' claims, one of which was that the request for coverage was "untimely." The bankruptcy trustee and Tomlinsons are continuing to pursue this matter with the insurance company.

On balance, the court does not accept as credible the Defendant-Debtor's position that he really was never aware that the Tomlinsons' wanted to know about insurance or that insurance had any significance in this whole litigation. For one thing, the Defendant-Debtor's reactions on the subject changed slightly from the first day of Trial to the second day of Trial. On the first day of Trial, the Defendant-Debtor stated that the subject of insurance came up at a prepetition deposition and that the Tomlinsons' counsel was given copies of the insurance then (which was not corroborated and, in fact, was credibly denied by the Tomlinsons' counsel). Then on the second day of Trial, the Defendant-Debtor was quietly adamant that he never knew that the Tomlinsons' were inquiring about insurance and it never occurred to him that it was in any way relevant to their lawsuit. The court cannot believe that lawyers at Bell Nunnally completed and submitted answers to the Requests for Admission with no input or awareness from the Defendant-Debtor. The court cannot believe that the Defendant-Debtor never realized until a day or so before the first day of Trial in this Adversary Proceeding that the Tomlinsons had complained that the Defendant-Debtor and Bella Vita had fraudulently misrepresented that there would be insurance for their Home project—including general liability that covered contractual liability and an umbrella policy. The court has no way of knowing what the Defendant-Debtor's exact motivation might have been to conceal the insurance. Was he worried about claims being made on his insurance policies and the ramifications to him and his business if that happened? The court can only speculate. But the court believes, based on the totality of the evidence and the unconvincing answers provided by the

Defendant-Debtor, that the late-revealed insurance in this Adversary Proceeding is just one more example of a pattern of concealment engaged in by this Defendant-Debtor vis-à-vis the Tomlinsons. The court believes the Defendant-Debtor kept silent about the insurance when it seemed convenient and advantageous to him to do so.

The court discussed with counsel and the parties after the second day of Trial that it felt compelled to consider sanctions—likely in the form of attorney's fee shifting—for the prolonged nondisclosure of insurance. ***This court believed that the Tomlinsons might have focused their efforts on insurance-collection issues earlier and not pursued this section 523 Adversary Proceeding so aggressively, if they had known about the insurance policies.*** In fact, various other creditors filed section 523 actions and reached agreements to stay indefinitely their trials in those matters, while they and the bankruptcy trustees explore the potential coverage for their claims and to see what happens with the Tomlinsons. The court invited counsel for the Tomlinsons to submit an Affidavit regarding attorney's fees they have incurred during this matter. The Tomlinsons thereafter submitted a request for $65,368.75 in fees and $3,272.19 in expenses,[101] to which the Defendant-Debtor has objected.[102]

This court has reviewed these fees. The court concludes that all of the fees and expenses incurred between May 25, 2017 (the date Plaintiffs first asserted their section 523 claim in this Adversary Proceeding) and August 23, 2017 (the date they learned about the insurance) should be reimbursed by Defendant-Debtor. Other fees and expenses submitted appeared to be related to the bankruptcy case more generally. The fees and expenses during this time frame totaled $29,440.51. However, it appears that one of the timekeepers (associate-attorney Beau Powell) was billed at a

---

[101] *See* DE # 55 in the AP.

[102] *See* DE # 62 in the AP.

$450 per hour rate during that time frame when his actual billing rate was represented to be $275 per hour.[103]  When one recalculates Mr. Powell's fees at $275 per hour, the total fees and expenses during this time frame amount to $19,384.26.  Thus, this is the amount that the court will award (irrespective of the ultimate section 523 nondischargeable debt) to the Plaintiffs against Defendant-Debtor as a sanction for failure to comply with Rule 26(a), failure to comply with the Alternative Scheduling Order, and failure to comply with the Joint Discovery Plan.  Again, the court considers the Defendant-Debtor responsible for these nondisclosures—particularly when one considers that there was a failure to produce insurance even prepetition when Defendant-Debtor was represented by other attorneys.

### Stage Five: Rule 15(b)(2) Motion for Leave to Amend Complaint.

Finally, at the end of the second day of Trial, the court observed that a couple of issues and theories had evolved over the course of Trial (and/or had developed in the evidence) that had not specifically been articulated in the Plaintiffs-Creditors' live complaint or other pre-trial pleadings.  First, the issue with regard to the insurance.  Specifically, the Plaintiffs-Creditors originally pleaded that the Defendant-Debtor and Bella Vita had misrepresented that they *had insurance* when they *did not*.[104]  Then, the Defendant-Debtor raised as a surprise defense at Trial that Bella Vita *did*, in fact, have general liability and umbrella liability insurance policies (producing copies of these policies, apparently for the first time).  As noted earlier, these policies were not on the Defendant-Debtor's trial exhibit list.  At that point (not surprisingly), things seemed to shift to an alternative argument by the Plaintiffs-Creditors—that they had been defrauded by the *concealment* of the insurance for many months pre- and postpetition (causing them damages, at least from the

---

[103] Plaintiffs-Creditors' counsel acknowledged this error.

[104] *See* Joint Pretrial Order, DE # 40 in the AP, p. 4 (¶ C.a.(a)) and p. 5 (¶ (a)(i) and (ii)).

incurrence of attorney's fees—in that they pursued legal strategies that they may not have pursued if they had known about the insurance). A second evolving theory seemed to emerge with regard to the switch over to helical piers, the puncturing of the water main, and the usages of the Tomlinson's $448,318.57 initial deposit. While all of these subject areas were identified in the Plaintiffs-Creditors' live complaint[105] and the joint pretrial order[106]—and clearly the Tomlinsons were arguing misrepresentations had been made with regard to these topics—it seemed that, over the course of the Trial, a theory began to evolve that the Defendant-Debtor and Bella Vita had concealed material information with regard to the helical piers, water line puncturing, and usage of the $448,318.57 initial deposit—and that this ***concealment*** may have ***fraudulently induced*** the Tomlinsons to stay in their Contract longer than they otherwise would have. The Plaintiffs followed up the oral discussion about these evolving theories, at the end of the Trial, with a Motion for Leave to Amend Complaint,[107] pursuant to Rule 15(b)(2). The Defendant-Debtor objected to the motion, primarily arguing that he did ***not*** consent to these new issues and his due process was violated.[108]

Rule 7015 of the Federal Rules of Bankruptcy Procedure adopts Rule 15 of the Federal Rules of Civil Procedure to adversary proceedings. Rule 15(b)(2) provides:

> When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

---

[105] *See* DE # 12 in the AP, Amended Complaint, p. 6 (¶ 13(b), (c), (d), (f), & (g).

[106] *See* Joint Pretrial Order, p.5 (¶ (d)(i)) and p.6 (¶ e (i) and (ii)).

[107] *See* DE # 54 in the AP.

[108] *See* DE # 60 in the AP.

While this court acknowledges that implied consent is not to be lightly inferred,[109] and a party should be given an opportunity to fully respond to new theories presented,[110] here, with regard to the insurance, the Defendant-Debtor was the one who offered into evidence the insurance policies that had never been disclosed and caused the new, changed theory of the Plaintiffs-Creditors to emerge. It seemed disingenuous for the Defendant-Debtor to argue he did not consent to the new theory articulated by the Plaintiffs-Creditors, when his improper actions were what caused the theory to evolve at trial. With regard to the evolving theory pertaining to the helical piers, the punctured water main, and the alleged concealment of how the Tomlinsons' $448,318.57 initial deposit was spent, the Defendant-Debtor always knew that these were the most controversial subjects in the entire Adversary Proceeding. He knew that Plaintiffs-Creditors vociferously complained of the Defendant-Debtor's actions where these issues were concerned. It would appear to the court that no new or different evidence was injected that required an about-face response on the part of the Defendant-Debtor. The type or species of fraud alleged by the Plaintiffs, under section 523(a)(2), was simply refined as the evidence developed at trial. Moreover, the court gave the parties multiple opportunities to brief legal issues for the court. As the Fifth Circuit has noted in a similar context, "a party's pleadings need not specify in detail every possible theory of recovery but need only plead sufficiently to give the defendant fair notice of the claim and the facts upon which it rests."[111]

Additionally, even if Rule 15(b)(2) does not permit an amendment here, the court notes that, under Rule 15(b)(1), "If, at trial, a party objects that evidence is not within the issues raised

---

[109] *Jimenez v. Tuna Vessel "Granada"*, 652 F.2d 415, 422 (5th Cir. 1981).

[110] *Morgan & Culpeper, Inc. v. Occupational Safety & Health Review Comm'n*, 676 F.2d 1065, 1068 (5th Cir. 1982).

[111] *Thrift v. Hubbard*, 44 F.3d 348, 356 (5th Cir. 1995).

in the pleadings, the court may permit the pleadings to be amended.  The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that evidence would prejudice that party's action or defense on the merits."  The Defendant-Debtor wholly failed to satisfy the court in his various arguments that any evolving theories or evidence presented at Trial by the Plaintiffs-Creditors prejudiced the Defendant-Debtor's defense on the merits.  And the court believed that permitting the amended pleadings aided in the overall presentation of the merits in this Adversary Proceeding.

Based on the foregoing, the court permitted the post-Trial amendment of Plaintiffs-Creditors' complaint.

Having presented above the procedural background and various issues the court had to address before ruling on the merits, the court now renders its findings of fact and conclusions of law based on the evidence.

## II.   FINDINGS OF FACT.

### A.   The Two-Year Courtship of the Plaintiffs-Creditors by the Defendant-Debtor.

1.   The Plaintiffs-Creditors[112] owned two residential lots located at 2005 Navasota Cove and 2007 Navasota Cove, Westlake, Texas (the "Lots") on which they decided to construct a custom home (the "Home").

2.   The Defendant-Debtor is a gentleman in his thirties and attended Baylor University. During college, he interned for Pulte Homes in Austin, Texas (focusing on homes ranging between $400,000 to $800,000) and later at a company called Jacobs Custom Homes in Georgetown, Texas (working 25% on custom homes and 75% on retirement "active adult homes").  The Defendant-

---

[112] Individually, the court will refer to LaDainian Tomlinson as "Mr. Tomlinson" and his wife, LaTorsha Tomlinson, as "Mrs. Tomlinson."

Debtor eventually moved to Dallas, Texas and helped manage his father-in-law's concrete plant for a couple of years. Then, in 2011, the Defendant-Debtor formed Bella Vita. Bella Vita started with only the Defendant-Debtor, his father, father-in-law, and one other individual. The Defendant-Debtor was the CEO and his father was CFO. Bella Vita eventually grew in size and according to the Defendant-Debtor, built 150 custom homes over its history.[113]

3.      Mr. Tomlinson is a well-known retired National Football League player and T.V. Network commentator. Mrs. Tomlinson, among other things, owns a business in California with 42 employees and is CEO of a charitable foundation. One of Bella Vita's sales associates, James Thokey, had a friend that was a friend of Mr. Tomlinson. James Thokey and the Defendant-Debtor discussed courting Mr. Tomlinson to let Bella Vita build a home for him, thinking it could be "a hallmark home for us" and "would be an expensive home," and Mr. Tomlinson was "a well-known person."[114]

4.      The Defendant-Debtor, during about a one-and-a-half year period, had continued follow up with the Tomlinsons, having meetings and dinners. He described Mr. Tomlinson as "an upstanding guy" and Mrs. Tomlinson as "a good person, too" although he would "disagree with a lot of her statements."[115]

5.      During his interactions with the Tomlinsons, the Defendant-Debtor made numerous representations to the Plaintiffs-Creditors (collectively, the "Defendant Representations") including that:

        a.   Bella Vita would obtain general liability and builder's risk insurance policies for the construction of the Home;

---

[113] *See* Transcript, pp. 13-16.

[114] *See* Transcript, pp. 17-18.

[115] *See* Transcript, pp. 19-20.

     b. Bella Vita was highly qualified and fully able to design and construct the Home;

     c. All work performed by Bella Vita on the Home would be performed in accordance with first-class custom home building practices;

     d. All work performed by Bella Vita on the Home would be in compliance with design plans;

     e. Bella Vita would use the highest quality materials on the Home;

     f. Bella Vita would appoint a full-time superintendent and full-time project manager to the project; and

     g. Bella Vita would assign James Thokey to serve as the Plaintiffs-Creditors' personal liaison to coordinate design selections

6.     Of particular importance to the Plaintiffs-Creditors was where the money that would be paid for their home construction project would be spent. With regard to this point, Mrs. Tomlinson credibly testified that she had some prior experience with custom home building, as she had built multi-million dollar homes in both California and Austin, Texas.[116] Mrs. Tomlinson further testified that "I just wanted to make sure that, one, what we were asking to be built was going to be actually what we received. And that the monies that we were giving to the builder were going towards the things that they were supposed to be going towards."[117] The Defendant-Debtor also credibly testified that he knew that the Plaintiffs-Creditors "had been burned" by another builder they used in the past. Therefore, a breakdown of how the Plaintiffs-Creditors' funds would be spent was important to the Plaintiffs-Creditors.

7.     In September 2014, the Plaintiffs-Creditors, in anticipation of signing a written contract with Bella Vita, made a payment to Bella Vita in the amount of $448,318.57 (the "Initial Deposit"). Their Home would be an 18,000 square foot home.[118] The Defendant-Debtor had never built a home of this magnitude, but the Defendant-Debtor testified that "we had a number of homes that were $2 million, $2.5 million that we had built around the same time frame" (it was

---

[116] *See* Transcript, pp. 19 & 132.

[117] *See* Transcript, pp. 136-37.

[118] *See* Transcript, p. 99.

unclear what that "number" actually was) and he thought Bella Vita was "well-suited" to build the Tomlinsons' Home.[119]

8.      However, it was not until April 30, 2015 that the Plaintiffs-Creditors entered into a New Construction Build on Your Lot Agreement (the "Contract") with Bella Vita for the construction of the Home.  The Contract was described by all witnesses at Trial as a "fixed-price contract" in the amount of $4,483,185.72 (although the words "fixed-price" are not used).  The seven-month gap in time between the payment of the Initial Deposit and the actual signing of the Contract was largely due to the intense negotiations that went into forming the precise language of the Contract.  In fact, the Plaintiffs-Creditors hired an attorney, Mr. Miller, to help advise them on the precise language that needed to be included in the Contract.

**B.      Key Terms of the Contract.**

9.      Unfortunately, while a great deal of time and effort was spent by the Plaintiffs-Creditors and the Defendant-Debtor in negotiating the Contract, the Contract itself is not a model of clarity—to put it kindly.  In addition to awkward wording and cumbersome numbering in places, capitalized terms are frequently used (suggesting significance) without actually being defined terms.  In any event, the entire set of documentation that constituted the Contract between the Plaintiffs-Creditors and Bella Vita consisted of: (a) a 10-page written document entitled "Bella Vita Custom Homes New Construction Build on your Lot Home Agreement," signed April 30, 2015 by the Defendant-Debtor as the designated representative of Bella Vita; (b) a one-page attachment thereto dated September 18, 2014, entitled "Bella Vita Custom Homes:  Estimated Budget & Draw Schedule"; (c) an 11-page Exhibit A thereto consisting of certain specifications, cost allocations and allowances for the Home project; (d) a complete set of construction plans and

---

[119] *See* Transcript, p. 108.

drawings (the "Final Plans")[120] that, according to the Contract, would be prepared by the Builder as part of the work covered by the Contract Sale Price; (e) a Builder's Limited Warranty; and (f) any Change Orders as described and approved in accordance with the Contract.[121]

10.    The Contract does actually contain a few noteworthy defined terms in Paragraph 3. For example:

> Change Order: Approved contractual document stating materials/items/allowances to be added to Home per Owner's request, which to be binding on Builder and Owner must be in writing and signed by Builder and Owner.

> Allowances: Amounts set forth in Exhibit A covering materials for the Improvements that are specified as "Allowance" items.

> Draw: Builder's ability to request dollars to be paid by Owner for work completed to date.

> Selection Sheet: Builder's document stating all material that Owner selects and approves.

> Work: All labor, materials, equipment and services necessary to construct the Improvements on the Property, including plans specified in the preceding subparagraph to be prepared by Builder subject to the final approval of the Owner.[122]

11.    The "Contract Sales Price" is set forth in paragraph 5 of the Contract and is shown to be $4,483,185.72, as set forth in Exhibit A attached to the Contract, "and shall cover, regardless of the actual amounts incurred for the following, all of the expenses of Builder necessary, required, or actually incurred to complete the Work, including, without limitation, (i) the cost of all materials, supplies and equipment to be incorporated into the Work; (ii) payment by Builder to its subcontractors with respect to the Work; (iii) costs of all premiums for insurance required pursuant

---

[120] *See* Plaintiffs-Creditors' Exhibit 1, ¶ 3.f.

[121] *Id.* at ¶ 4.

[122] *Id.* at ¶ 3

to this Agreement; (iv) taxes arising out of or related to the Work, including sales, use, employment, and income taxes; (v) all permits required to perform and complete the Work; (vi) overhead and other general expenses of Builder; (vii) all expenses related to the correction of damaged, defective or nonconforming Work; (viii) all architect and engineering fees required to perform the Work and complete the Project; (ix) the profit of and fee for Builder's performance of the Work; and (x) all submittals to, and processing and obtaining approvals of Vaquero and its Design Review Committee. ***Builder shall furnish Owner with copies of all bids received by Builder in connection with bidding this Project and completing Exhibit A attached to this Agreement; and with each draw request, Builder shall furnish Owner with copies of all invoices for items included in such draw request***."[123]

12.     The Contract provided, in a paragraph entitled "Escrows,"[124] that, prior to execution of the Contract, the Plaintiffs-Creditors "deposited with Builder the Initial Deposit of $448,318.57, being ten percent (10%) of the Contract Sales Price, and [Defendant-Debtor] commenced to proceed to Work."  The Defendant-Debtor agreed "to retain the Initial Deposit as part of the Contract Sales Price and shall apply it against the first approved Draw Requests until such funds are exhausted (and [Plaintiffs-Creditors] shall pay any remaining amounts due for approved Draw Requests)."[125]

---

[123] *Id.* at ¶ 5 (emphasis added).

[124] *Id.* at ¶ 6.

[125] There is another sentence near the end of this paragraph 6 that states in all capital letters, "OWNER ACKNOWLEDGES AND AGREES THAT THE INDEPENDENT CONSIDERATION IS NONREFUNDABLE FOR ANY REASON."  "Independent consideration" is not defined, and it is not entirely clear if this meant that the Initial Deposit was intended to be nonrefundable for any reason or not.  If the intention of the parties was to make the $448,318.57 Initial Deposit a nonrefundable deposit, then it would appear that this would be an unenforceable forfeiture penalty.  *See, e.g.*, *Stewart v. Basey*, 245 S.W.2d 484, 485–486 (Tex. 1952) (setting forth two-part test in determining whether a stipulated damage provision of a contract should be enforced as liquidated damages or denied as a penalty provision—specifically a liquidated damages provision will not be enforceable unless it is a reasonable forecast of just compensation for harm caused by a breach and the harm caused by such breach is incapable of accurate estimation).  But, more importantly, such an interpretation would seem to be wholly inconsistent with the requirement

13. The Defendant-Debtor repeatedly referred in testimony to the Contract as a "fixed-price contract" and seemed to suggest that the requirement of providing Draw Requests or other evidence of funds spent was not very significant (particularly with regard to the Initial Deposit).[126] However, the Contract language belies such a suggestion. First and foremost, draw requests with copies of invoices (among other documentation) were required by the Contract—plain and simple.[127] Second, paragraph 6 dealing with the "escrow" of the Initial Deposit clearly contemplated that the Defendant-Debtor would retain it and "apply it against the first approved Draw Request."[128] Finally, the second paragraph of paragraph 5 discusses how situations were to be handled in which actual costs of allowances set forth on Exhibit A to the Contract turned out to be either greater or less than the amounts on Exhibit A (with the Plaintiffs-Creditors, in some situations, being entitled to savings).[129]

14. The Contract at paragraph 7.A.3, last sentence, states that "Builder shall make no

---

earlier in paragraph 6 that draw requests had to be provided to and approved by the Plaintiffs-Creditors before the funds in the "escrow" could be applied to the Defendant-Debtor's Work. Such an interpretation would also be inconsistent with paragraphs 18 and 19 of the Contract (each dealing with specific circumstances when Deposits can be retained).

[126] It is noteworthy that the Plaintiffs-Creditors were paying all cash for the Home—no bank loan was involved. This court believes (based on the Defendant-Debtor's testimony and actions) that the Defendant-Debtor thought he could be more relaxed about the draw request process with the Plaintiffs-Creditors than he might otherwise be in a situation in which a bank lender is involved. But the Contract clearly required him to provide documentation in order to be entitled to "draw" money from the Plaintiffs-Creditors (even in the case of the Initial Deposit).

[127] *See* Plaintiffs-Creditors' Exhibit 1, ¶¶ 3(h), 5 (last sentence), 6 (second sentence), and 8. More specifically, Paragraph 8 of the Contract actually stated that the Plaintiffs-Creditors' approval of a Draw Request was subject to receiving Draw Requests with copies of invoices covered by the Draw Request as well as various other items including a "comparison budget, showing overages/underages of actual versus original Contract Sales Price budget, for the items covered by the draw request and on an aggregate basis for the entire Project budget"; lien waivers; a "certification that the Work covered by the draw request has been completed according to Contract, executed by the chief executive officer or chief financial officer of the Builder"; and a builder certification "certifying that all suppliers and subcontractors covered by the draw request have been paid, or will be paid from disbursement of the proceeds of the draw request."

[128] *Id.* at ¶ 6.

[129] *Id.* at ¶ 5.

changes to the Improvements or alterations from the Construction Documents executed by Owner, *unless agreed in writing by Owner, at Owner's sole and exclusive option*."[130]  Furthermore, the Contract at paragraph 7.A.5 (last paragraph) states that "If Builder discovers that changes or corrections are necessary for any of the foregoing reasons [one of such foregoing reasons being "unusual subsurface soil conditions, topography, or ground water"], *Builder will promptly notify owner*."[131]

15.    The Contract at paragraph 9.C. provides that the Defendant-Debtor agrees to build the Home "in accordance with first-class, custom home industry standard building practices . . . and otherwise substantially in compliance with the Final Plans and the Construction Documents, including, without limitation, the customer selection sheet and customer change orders, if any. However, Owner agrees Builder may substitute materials of similar quality, *but only with the prior written consent of Owner.*"[132]  Paragraph 9.E. adds (last sentence) that "Builder reserves the right to make changes in the plans, specifications, materials, and components being used at the time of purchase, *but only with prior written consent of Owner.*"[133]  With regard to these various "consent" provisions in the Contract, Mrs. Tomlinson credibly testified that the Tomlinsons had experienced problems with prior builders they had used in the past, and they wanted "the builder to follow these plans, and if you're not following these plans, we want to know it and approve it."[134]

---

[130] *Id.* at ¶ 7.A.3. (emphasis added).

[131] *Id.* at ¶ 7.A.5 (emphasis added).

[132] *Id.* at ¶ 9.C. (emphasis added).

[133] *Id.* at ¶ 9.E. (emphasis added).

[134] *See* Transcript, p. 137.

16.    Furthermore, the Contract at paragraph 9.J. provides that "Builder shall provide and maintain at all times, Builder's Risk Insurance as protection against fire, storm, theft or vandalism during the course of construction of the Home in an amount equal to or greater than the Contract Sales Price.  Builder shall include Owner as additional insured."[135]  In addition, "Builder shall, at its own expense, during the entire period of Work, carry . . . commercial general liability insurance (*including contractual liability coverage*) necessary for the full protection of Builder and Owner from injury to persons or property arising from the acts of the Builder or its subcontractors during the progress of the Work with limits of at least $1,000,000 per occurrence."[136]  Such paragraph goes on to provide that "Certificates of insurance shall be delivered to Owner . . . prior to the Initial Closing Date [not a defined term]" and that each policy shall provide "for Owner to be named as an additional insured on the commercial general liability insurance policy."[137]

17.    Additionally, paragraph 26 of the Contract contains what has been referred to as an "entireties" clause.  Specifically, it provides that the Contract and its attachments:

> constitutes the entire agreement between the parties and all prior negotiations, promises and/or representations, whether oral or written, not expressly set forth herein, are of no force and effect and do not constitute a part of this Contract.  Owner represents to Builder that Owner has not relied and is not relying upon any warranties, promises, guaranties, or representations made by Builder . . . except as contained in this Contract.[138]

18.    Finally, on the last page of Exhibit A, which is attached to the Contract, under "Bella Vita Custom Homes Additional Expenses," there is a line item for "On-Site Project

---

[135] *See* Plaintiffs-Creditors' Exhibit 1, ¶ 9.J.  This requirement of a Builder's Risk Insurance policy was reiterated at paragraph 19 of the Contract with slightly broader terms as to what needed to be covered—i.e., insurance to cover the cost of construction of the house in the event of "destruction of the improvements by fire, earthquake, explosion, hail, windstorm, or any other casualty prior to completion and Owner's occupancy."  *Id.* at ¶ 19.

[136] *Id.* at ¶ 9.J. (emphasis added).

[137] *Id.*

[138] *Id.* at ¶ 26.

Manager, Vendor, Budget and Accounting Management throughout 2-year build," with an associated expense of $118,087.14.[139] Mrs. Tomlinson credibly testified that it was important to have someone full-time on their project "because Bella Vita had already made it clear that the size of our house would be the first that they'd ever built that was that big, and because of that, to reassure us that it would be fine, even though it's bigger than most times they'd built, they were getting a full-time superintendent for the job."[140]

### C.  Construction Commenced on the Home and Problems Ensued

*1.  Failure to Provide Dedicated Personnel That Were Promised.*

19.  Once the Contract was finally signed and construction of the Home began, problems began to arise.  First, the Plaintiffs-Creditors' full-time promised personal liaison, James Thokey (the individual who knew a friend of Mr. Tomlinson's and had initiated the original contacts with the Tomlinsons), relocated to Austin, shortly after the Contract was signed, as a result of being promoted to manage the sales team for Bella Vita in Austin.  Thus, he was not fully available to the Plaintiffs-Creditors during the construction phase.[141]  Second, the project superintendent that was promised was not on the job full-time.  The Defendant-Debtor acknowledged in testimony that Chase White was the full-time dedicated project superintendent for the project that was the "babysitter" on the job and was required to be there daily, but, as detailed below, there were certain instances where this proved to be false (and quite costly).

---

[139] *Id.* at Exhibit A, p. 11.

[140] *See* Transcript, p. 172.

[141] *See* Plaintiffs-Creditors' Exhibit 4.

2. *Draw Requests Made Without Actual Cost Information, Invoices, or Other Required Documentation.*

20. More problematic to the Tomlinsons, within almost a month of signing the Contract, the Plaintiffs-Creditors began receiving draw requests from Bella Vita for more funds: (a) even after paying Bella Vita the Initial Deposit of $448,318.57; and (b) without being presented an adequate accounting of how funds had been spent on their Home project thus far.  As earlier noted, the Contract required significant financial documentation to be submitted in connection with draw requests.[142]  Bella Vita wholly failed to comply with the Contract in this regard.  The court finds that the Defendant-Debtor not only was personally involved with this omission[143] of information, but he misrepresented to the court that he provided more information to the Tomlinsons than he did.  The Defendant-Debtor specifically testified that he provided cost reconciliations to Mrs. Tomlinson for the Home project "between three and five times" through emails to her,[144] but there was no supporting evidence and the court simply does not believe the Defendant-Debtor.  The credible evidence shows that, on or around May 29, 2015, Mike Moss,[145] the vice president of construction at Bella Vita, requested from the Tomlinsons the first $68,310 draw towards "Site Prep," "Lot Clearing," "Erosion Control," "Temp Fencing," and "Utilities."[146]  Mrs. Tomlinson then wrote a check for $68,310 on June 1, 2015 for the draw request, but also requested an accounting (as required by the terms of the Contract) as to where the Initial Deposit

---

[142] *See* Plaintiffs-Creditors' Exhibit 1, ¶¶ 3(h), 5, 6 and 8.

[143] *See* Transcript, pp. 59 (lines 16-24); 60 (lines 8-14); 61 (lines 8-9 & 19-25); and 62 (lines 6-18).

[144] *See* Transcript, p. 62 (lines 11-15).

[145] Mike Moss, the vice president of construction, appeared to be the other individual at Bella Vita (other than the Defendant-Debtor) who worked directly with the Plaintiffs-Creditors.

[146] *See* Plaintiffs-Creditors' Exhibits 13-40 & 13-50.

had been spent.[147]  It is important to note that this is the second time that Mrs. Tomlinson had requested an accounting for the Initial Deposit.  Specifically, the evidence showed that, in response to a text from Mrs. Tomlinson on February 28, 2015, asking how much of the Initial Deposit had been spent, the Defendant-Debtor had stated that he "had already spent $135,000 of it in mobilization."[148]  In any event, on June 2, 2015, Mike Moss responded to Mrs. Tomlinson's request saying "Sure Thing . . . I will get with the accounting folks today and see if I can get answers together on the cost to date."[149]  Then, on or about June 4, 2015, someone named "Carrie" sent Mrs. Tomlinson an excel accounting document showing $131,452 of the Initial Deposit had been spent for "Site Work."[150]  At that point, Mrs. Tomlinson logically assumed that she would only have around $7,000 left to pay on "Site Prep"—since the original budget on the draw request showed $207,000 going toward "Site Prep" ($131,452 plus the new $68,310 draw request = $199,762).[151]  Moreover, this excel accounting document also showed that $72,556 had been spent on "Permits/Fees," $104,360.79 had been spent on "Architectural/ Engineering" (which included $22,415.93 for a "Builder's Risk Policy"), $8,995.51 had been spent on "BVCH Overhead," and $23,374.69 had been spent on "BVCH Profit."[152]

21.    However, just three weeks later on June 23, 2015, Mike Moss sent the Plaintiffs-Creditors a second draw request for $138,690, to complete all the draw requests for the

---

[147] *Id.*

[148] *See* Plaintiffs-Creditors' Exhibit 13-101, p. 285.  There was also reference to an Excel document that the Defendant-Debtor had sent further breaking down the $135,000 that had been spent and Mrs. Tomlinson had said "Everything looked good!"  However, the Excel document was never provided to the court as part of the evidentiary record.

[149] *See* Plaintiffs-Creditors Exhibit 13-50.

[150] *See* Plaintiffs-Creditors Exhibit 5.

[151] *See* Plaintiffs-Creditors' Exhibits 13-40 & 13-101.

[152] *See* Plaintiffs-Creditors' Exhibit 5.

"Site Prep." [153] This $138,690 was far more than the $7,000 that Mrs. Tomlinson thought remained for the "Site Prep" work. While Mrs. Tomlinson did end up writing the $138,690 check for the second draw request, she credibly testified that she was troubled by such request, since doing the simple math, Bella Vita appeared to be over budget on "Site Prep" by $131,452 (*i.e.*, $131,452 was represented in the document sent on June 4, 2015 to be the portion of the Initial Deposit spent on "Site Work" plus $68,310 plus $138,690 = $338,452). To be clear, the original budget for "Site Prep" was $207,000. Further, Mrs. Tomlinson credibly testified that this did not make sense to her because, when she went to look at the construction site, she did not see any of the items that the first $68,310 draw request was supposed to go toward (*i.e.*, erosion control or temporary fencing, and she was already paying utilities out of her own pocket), so she could not understand where the money had been spent. [154] Despite her concerns, it appeared that some level of construction continued on the Home.

        3.      *The Subsurface Water, Helical Piers, and Water Main Puncturing Fiasco.*

22. Meanwhile, sometime in early to mid-July 2015, while drilling for the installation of concrete piers (as provided for in the Contract and in the preliminary foundation plans for the Home, as designed by the engineer hired by Bella Vita, Eric Davis), [155] Bella Vita unexpectedly

---

[153] *See* Plaintiffs-Creditors' Exhibit 13-40.

[154] *See* Plaintiffs-Creditors' Exhibit 13-101.

[155] *See* Plaintiffs-Creditors Exhibit 1, Exhibit A. p. 3; Plaintiffs-Creditors Exhibit 3 (Henley Johnston Report dated June 17, 2014 with attached Foundation Plan with Original Drawing Date of October 6, 2014); Plaintiffs-Creditors' Exhibit 13.7 (Foundation Plan with Original Drawing Date of October 6, 2014); and Plaintiffs-Creditors' Exhibit 13.29 (April 17, 2015 bid proposal for the concrete piers from Pennington Construction). Exhibit A to the Contract provides for "Post Tension on Piers Foundation per Engineer Design and soils report." The June 17, 2014 Henley Johnston Report seemed to contemplate concrete piers *if* piers were used and the Foundation Plan contemplates concrete piers. While it is somewhat unclear when the Plaintiffs-Creditors actually received and reviewed copies of the Foundation Plan or the June 17, 2014 Henley Johnston Report, Mrs. Tomlinson credibly testified that "the concrete piers were spelled out in our contract," and, thus, the court believes that they must have been reviewed by the Plaintiffs-Creditors either prior to or around the same time that the Contract was signed. *See* Transcript, p. 153.

encountered subsurface water at the Lots.[156] As a result of the water, the drilled holes were unstable, which prevented the installation of the stand-alone concrete piers that the Contract contemplated.[157]

23. Upon discovering this problem, the Defendant-Debtor, without either notice to or the written consent of the Plaintiffs-Creditors, as required under the terms of the Contract, made the decision to install steel helical piers in place of the concrete piers after consulting with Bella Vita's engineer on the project, Eric Davis.[158] The Defendant-Debtor had never worked with helical piers. While the Defendant-Debtor testified that he informed the Plaintiffs-Creditors about the change in pier type almost immediately upon discovering the subsurface water, the court did not find such testimony credible. Rather, the evidence shows that, at least as early as July 20, 2015, Bella Vita was receiving bids for a change over to helical piers and, at the same time, sending emails to the Tomlinsons with no mention of the water problems and pier change.[159] The credible testimony of Mrs. Tomlinson, as well as the other documentary evidence, seems to indicate that the Plaintiffs-Creditors did not know about the change to the pier type until shortly before August

---

[156] Subsurface water was not an unforeseen condition in that it was identified in the Henley Johnson Report (an engineering report) dated June 17, 2014. *See* Plaintiffs-Creditors' Exhibit 3, pp. 27-41. However, the Defendant-Debtor testified that the water levels encountered in July 2015 were much higher then what was initially addressed in the Henley Johnson Report. *See* Transcript, p. 42.

[157] The record is unclear as to when exactly the subsurface water was encountered. It appears that it happened in early-to-mid July 2015. The court concludes it must have been prior to July 20, 2015, which is the date on a bid proposal for the new 304 helical piers—as further addressed below. *See* Plaintiffs-Creditors' Exhibit 13.74.

[158] *See* Transcript, pp. 42-43, 102-104.

[159] Specifically, the court notes that there was a bid proposal submitted to Bella Vita by a company called Hargrave & Hargrave dated July 20, 2015 for the 304 helical piers for $112,838.72 that was sent to both Mike Moss and Chase White on the morning of July 20, 2015 that said "attached is new revised pier layout. 304 piers." Yet in an email to the Plaintiffs-Creditors from Mike Moss (copying Chase White) with the subject "Delayed update" that very same day, there was no mention at all of the discovery of subsurface water nor the change to helical piers, but rather Mike Moss stated: "Last Week: started drilling piers, started drilling wells for geothermal, form board survey was approved. This Week: finish drilling piers, finish drilling wells for geothermal." *See* Plaintiffs-Creditors' Exhibit 13.74. This seems very suspect and provides further support to Mrs. Tomlinson's credible testimony that they were never informed about the intention to change the pier type.

3, 2015.[160]  In summary, there was a significant delay, and Mrs. Tomlinson credibly testified that "they had ample time to come to us and tell us about this issue while they were waiting on those piers to be presented on-site from Hargrave & Hargrave, but no one had said anything to us about it."[161]  And, of course, the Tomlinsons never consented in writing to a change in pier type.

24.     To make matters worse, after making the unilateral decision to change the pier type, and while drilling for the new helical piers, a water line was punctured by the contractors installing the new helical piers, which caused flooding on the building pad and adjacent land on the Lots.[162] A video showing the flooding was submitted into evidence that was taken by the subcontractor installing the helical piers—which the Tomlinsons obtained much later.[163]  The flooding was quite bad.  The credible evidence showed that no one from Bella Vita informed the Plaintiffs-Creditors of the flooding on the day of the event and, in fact, Mrs. Tomlinson credibly testified that they did not learn of the flooding until several days later from a neighbor[164] at a charity event.[165]

---

[160] *See* Plaintiffs-Creditors' Exhibit 13.98. Mrs. Tomlinson credibly testified that she was orally told about the change to helical piers at a meeting with Mike Moss sometime in late July 2015. *See* Transcript, pp. 161-62. This is consistent with an August 5, 2015 email from Mrs. Tomlinson that states ". . . I didn't receive so much as a call, text, or email regarding changing the whole foundation support structure of my home.  Again, it seems like the guidelines and rules change on a whim.  And this whole switching my foundation support without my knowledge is also costing me even more money . . . ." *See* Plaintiffs-Creditors' Exhibit 13.101.

[161] *See* Transcript, p. 164.

[162] Again, it is unclear from the evidence on what exact day this happened or whether Bella Vita was at fault for the puncture.  Specifically, the court notes an email dated August 21, 2015 from Chase White referencing an invoice from the City of Westlake for the broken water line and noting that there is a disagreement on who was responsible and that "[w]e need to have a meeting with them and hash this out."  *See* Plaintiffs-Creditors' Exhibit 13.110; Transcript, p. 225-26.

[163] *See* Plaintiffs-Creditors' Exhibit 14.

[164] The neighbor was identified as current Dallas Cowboys tight end, Jason Witten.  *See* Transcript, pp. 153-155.

[165] The court would especially note that, when being questioned directly by the court, the Defendant-Debtor actually testified that the discovery of the subsurface water and the striking of the water line all happened within the same day or two and he notified the Plaintiffs-Creditors the very day it happened.  Not only did Mrs. Tomlinson credibly refute such testimony, but the court finds that the additional documentary evidence at the Trial supports the notion that the discovery of the subsurface water and the striking of the waterline by Hargrave and Hargrave when installing the helical piers were two separate and distinct events which occurred over a multiple week span of time.  *See* Transcript, pp. 225-27.

25.    Upon learning of the flooding from their neighbor, the Plaintiffs-Creditors drove over to the Lots and they saw "things sticking out of the ground" (*i.e.*, the helical piers).  The Plaintiffs-Creditors then had a meeting with Mike Moss (Bella Vita's vice president of construction) and Chase White (the Tomlinsons' dedicated full-time project superintendent) a few days later and it was at that point that they learned about the change in the pier type.[166]  Mrs. Tomlinson credibly testified that she was very concerned upon hearing that Bella Vita unilaterally determined to change the pier type without informing the Plaintiffs-Creditors, and that she wanted to do some further investigation regarding helical piers.  She was very concerned that Bella Vita had no experience using helical piers.  Specifically, Mrs. Tomlinson testified that she contacted the company that did the installation of the helical piers (*i.e.*, Hargrave & Hargrave) to learn more about what had been happening with the piers.[167]  Mrs. Tomlinson also testified that she learned that Chase White (again, the dedicated full-time project superintendent) was not on site when the water line was punctured.[168]  Mrs. Tomlinson also testified that she tried to get into contact with the engineer hired by Bella Vita, Eric Davis, but that Mr. Davis would not speak to her.  Mrs. Tomlinson also credibly testified that, upon finally receiving the engineering report from Mr. Davis recommending the helical piers, she discovered a significant gap in time between such recommendation and the actual installation date of the new helical piers, and that she was concerned that no one at Bella Vita ever attempted to reach out to her or her husband.

26.    Importantly though, Mrs. Tomlinson credibly testified that, had the Plaintiffs-Creditors been approached about the change in pier type, they would not have approved their

---

[166] *See* Transcript, pp. 105-106, 153-155.

[167] *See* Transcript, pp. 164, 226-27.

[168] *See* Transcript, p. 172.

installation.

27.     Mrs. Tomlinson credibly testified that, upon cancelling their contract with Bella Vita, they hired their own engineers (Tom Witherspoon and Sunjong Engineering), and they did **not** recommend the use of helical piers for the Lots, but rather steel-cased concrete piers, and, in fact, that is the type of pier that was installed by the new builder that was hired to construct the Home after Bella Vita was terminated.[169]  She also credibly testified that three different companies that the Plaintiffs-Creditors hired to come out and look at the pier issue had all recommended that the helical piers come out and they should not be used because of the Home's wide footprint.[170] Finally, Mrs. Tomlinson testified that "I also wouldn't have used helical piers and been a guinea pig with a builder that's using them for the first time. If I was going to use them, I would want a builder that is experienced in them, had been using them for years. I wouldn't want to be the guinea pig on my $4 million home for this builder."[171]

*4.     More Failures to Provide Adequate Cost Information.*

28.     Around the same time the pier issue and the site flooding arose, the Plaintiffs-Creditors also began to send additional emails to the Defendant-Debtor and Bella Vita requesting further accountings of where the money tendered by the Plaintiffs-Creditors was being spent.  To be clear, during the period that Bella Vita was constructing the Home, the Plaintiffs-Creditors had tendered to Bella Vita $655,318.57 (collectively, the $448,318.57 Initial Deposit plus the two draw requests of $68,310 and $138,690).

29.     First, on August 5, 2015, Mrs. Tomlinson sent the Defendant-Debtor a rather

---

[169] *See* Transcript, pp. 166-67 & 173-74.

[170] *See* Transcript, p. 166.

[171] *See* Transcript, p. 164.

lengthy email asking, among other things, "where is my initial 10% deposit?"[172]  In response, the

Defendant-Debtor sent an email on August 6, 2015 to the Plaintiffs-Creditors and attached the

"latest cost download" to "help clear up much of the confusion" regarding where the money

tendered to Bella Vita by the Plaintiffs-Creditors had been spent.[173]  The Defendant-Debtor also

stated in this August 6, 2015 email that:

> [r]emember the draw scheduled does not precisely coordinate with the costs of the
> home… it is impossible especially with a fixed price contract. After reviewing the
> attachments, I believe you will have a clearer understanding.  I am happy to speak
> with your CPA and familiarize him as well.  Per your statement in red, this is
> accurately complying.  So you can see your deposit has been heavily utilized and
> until we receive the next draw, we are at complete depletion and will be
> underfunded on the geothermal, cables, and soon more concrete in the next few
> days.[174]

In closely examining the attached "reconciliation," however, there appears to have been a lack of

full disclosure on, at least, where the Initial Deposit had been spent.  Specifically, adding up

amounts on this reconciliation spent on "Permits/Fees ($72,556)," "Architectural/Engineering

($107,235.79)," "Post Arc Design Development ($1,239.64)," "BVCH Overhead

($14,414.30),"[175] and "BVCH Profit ($37,445.33),"—all of which could arguably fit into the

category of "Soft Costs," that the Defendant-Debtor testified was the source of where the Initial

Deposit was spent—this only totaled *$232,901.06*.  Thus, there was still a failure of Bella Vita and

the Defendant-Debtor to account for roughly *$215,418* of the Plaintiffs-Creditors' Initial Deposit

---

[172] *See* Plaintiffs-Creditors' Exhibit 13.101.

[173] *See* Defendant-Debtor's Exhibit 6.

[174] *Id.*

[175] Defendant-Debtor's Exhibit 6 showed overhead of approximately $14,000.  At the Trial, the Defendant-Debtor's father testified that this number should have been closer to $57,000, but did not provide any further documentary evidence to support this calculation.

($448,318.57 minus $232,901.06).[176] And, in fact, Mrs. Tomlinson recognized this omission when she sent yet another follow up email to the Defendant-Debtor early in the morning on August 7, 2015, requesting another breakdown since there remained a failure of Bella Vita and the Defendant-Debtor to account for where the Initial Deposit was spent.[177] Thereafter, Mrs. Tomlinson received a purported final reconciliation, but it still did not explain where the Tomlinsons' Initial Deposit had all been spent.[178]

5.      *No Builder's Risk Insurance Policy.*

30.      As noted a couple of times herein, the Tomlinsons received certain documents during the course of dealing with Bella Vita indicating that a Builder's Risk Insurance Policy had been purchased with their Initial Deposit.[179] That turned out to be false. No Builder's Risk Insurance Policy was ever purchased. The Defendant-Debtor had three basic explanations for this. First, he testified that he never, in his practice, purchased a Builder's Risk Insurance Policy until he erected lumber on a home, and the Tomlinsons' never got to this stage. Second, he testified that the cost reports that he had provided that seemed to indicate that $22,415.93 had been spent

---

[176] *Id.*

[177] *See* Plaintiffs-Creditors' Exhibit 13.107.

[178] At the Trial, there was a significant discussion about the Plaintiffs-Creditors' Exhibit 13.109 (a so-called "final reconciliation"). While it is unclear (based on the testimony of the Defendant-Debtor and Mrs. Tomlinson) when the Plaintiffs-Creditors actually received Exhibit 13.109, the Defendant-Debtor testified that the document represented the final reconciliation of where the aggregate $655,318.57 of funds provided by the Plaintiffs-Creditors to Bella Vita had been spent through August 18, 2015. Again, even though the final reconciliation purports to itemize where the Plaintiffs-Creditors' funds had been spent, there still appears to be a "gap" in the accounting. More specifically, the court is adding $72,556 for permits/fees, $110,016.92 for architectural/eng/ins/surveys (including $22,415.93 for a builder's risk policy, which according to the Defendant-Debtor's testimony was never purchased), $1,239.64 for interior decoration, $17,914.30 for BVCH overhead, and $46,549.33 for BVCH profit for a total of $248,276.19 in what the Defendant-Debtor has characterized as "soft cost" expenses. Subtracting that from the Initial Deposit, there is still a failure to account for $200,042.38 of the Initial Deposit. This is so despite the fact that the Defendant-Debtor had previously represented to the Plaintiffs-Creditors that the Initial Deposit had been fully spent on "soft costs" in both draw request #1 dated May 25, 2015 and draw request #2 dated June 23, 2015. *See* Plaintiffs-Creditors' Exhibit 13.40.

[179] *See* Plaintiffs-Creditors' Exhibits 5 & 13-109 & Defendant-Debtor's Exhibit 6.

on a Builder's Risk Insurance Policy really meant to convey that this amount **would be** spent for such a policy. Third, the Defendant-Debtor offered a "what-difference-does-it-make" rebuttal—stating that a Builder's Risk Insurance Policy would not have covered anything like the water damage to the Tomlinsons' building pad (the Arbitration Panel awarded $235,000 for needed repair to the building pad).

31. The court was not presented with any expert evidence regarding when a Builder's Risk Insurance Policy is typically purchased by builders or whether it might cover damage from flooding caused by a contractor striking a water main. However, the court knows a misrepresentation when it sees one, and the court finds that the Plaintiffs-Creditors' Exhibit 5, Plaintiffs-Creditors' Exhibit 13-109, and the Defendant-Debtor's Exhibit 6 falsely implied that Bella Vita spent $22,415.93 of the Tomlinsons' Initial Deposit on a Builder's Risk Insurance Policy.

**D. Termination of the Contract by the Plaintiffs-Creditors, the Prepetition Arbitration and Resulting Arbitration Award, and the Filing of the Adversary Proceeding.**

32. On or around August 7, 2015, the Plaintiffs-Creditors sent a letter through their then attorney, Bill Miller, terminating the Contract with Bella Vita. Then, on September 8, 2015, the Plaintiffs-Creditors, through their new attorney, Van Shaw, sent two more letters to Bella Vita demanding $1,310,637.14 in compensation based upon Bella Vita's violations of the terms of the Contract, the DTPA, and Chapter 27 of the Texas Property Code.[180]

33. On September 8, 2015, the Tomlinsons filed their Original Petition and Jury Demand in the 153rd Judicial District Court against Steven Clem and Bella Vita in Tarrant County District Court (the "State Court Action").

---

[180] *See* Plaintiffs-Creditors' Exhibits 7 & 8.

34.     On November 12, 2015, the 153rd Judicial District Court granted the Defendant-Debtor's Motion to Compel Arbitration and Dismiss.  Thereafter, the Tomlinsons submitted their claims (as set forth in the Plaintiffs' Second Amended Statement of Claims) to arbitration with the American Arbitration Association (the "Prepetition Arbitration").

35.     On September 26, 2016, the Plaintiffs-Creditors were awarded damages by the arbitration panel (the "Arbitration Panel") against both the Defendant-Debtor and Bella Vita, jointly and severally, in the amount of $744,711—which was later adopted into a Final Judgment Confirming Arbitration Award on September 30, 2016 (the "Arbitration Award").[181]

36.     The Defendant-Debtor filed a chapter 7 bankruptcy on December 14, 2016.  On that same date, Bella Vita also filed a chapter 7 bankruptcy.

37.     On April 3, 2017, the Plaintiffs-Creditors filed the Adversary Proceeding against the Defendant-Debtor objecting to the Debtor's discharge pursuant to section 727(a)(4) of the Bankruptcy Code.

38.     On May 25, 2017, the Plaintiffs-Creditors filed their First Amended Complaint, which in addition to the section 727(a)(4) claim, asserted that the Arbitration Award was nondischargeable pursuant to section 523(a)(2)(A) of the Bankruptcy Code.

39.     At trial docket call on August 14, 2017, the parties indicated that the Plaintiffs-Creditors would not be going forward on their section 727 claim, but would only be asserting their section 523(a)(2)(A) cause of action at trial.

## III.    CONCLUSIONS OF LAW.

1.     Bankruptcy subject matter jurisdiction exists in this Adversary Proceeding pursuant to 28 U.S.C. § 1334.  This is a statutory core proceeding, pursuant to 28 U.S.C. § 157(b)(2)(B) and

---

[181] *See* Plaintiffs-Creditors' Exhibit 12.

(I); thus, the bankruptcy court has statutory authority to enter a final order.  Moreover, the court has determined that it has Constitutional authority to enter a final order in this matter.  Finally, venue is proper before this court, pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The Plaintiffs-Creditors have brought a claim against the Defendant-Debtor under section 523(a)(2)(A) of the Bankruptcy Code.  The standard of proof in any action under section 523(a) of the Bankruptcy Code is preponderance of the evidence.[182]

3.      "Section 523(a)(2)(A) is not designed to protect debtors; rather it is designed to protect the victims of fraud."[183]  That being said, even in the section 523(a)(2)(A) context, "[e]xceptions to discharge are strictly construed against the creditor and liberally construed in favor of the debtor."[184]

4.      Section 523(a)(2)(A) of the Bankruptcy Code provides that:

A discharge under section 727 ... of this title does not discharge *an individual debtor from any debt* for money, property, services, or an extension, renewal, or refinancing of credit, to the extent *obtained by false pretenses*, *a false representation*, or *actual fraud*, other than a statement respecting the debtor's or an insider's financial condition.[185]

Here, the Plaintiffs-Creditors have argued that the Defendant-Debtor made numerous "false representations" to the Plaintiffs-Creditors both before and after the Contract was signed.

5.      As a preliminary matter—before the court even gets to the issue of whether there is a nondischargeable debt in this case, pursuant to section 523(a)(2)(A) of the Bankruptcy Code— the court must address whether there is actually a "debt" of the *Defendant-Debtor*—in other

---

[182] *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

[183] *Tummel & Carroll v. Quinlivan (In re Quinlivan)*, 434 F.3d 314, 319 (5th Cir. 2005).

[184] *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 619 (5th Cir. 2011) (citing *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997)).

[185] 11 U.S.C. § 523(a)(2)(A) (2017).

words, a basis to impose personal liability upon the Defendant-Debtor, when it was ***Bella Vita,*** a Texas limited liability company ("LLC"), that actually contracted with the Plaintiffs-Creditors.  To be clear, if there is no debt to begin with, ***as to the Defendant-Debtor***, then there is no debt to discharge—much less a debt to except from discharge.[186]  This ultimately requires the court to first determine if it is necessary to pierce Bella Vita's entity veil, since Bella Vita is the entity with which the Plaintiffs-Creditors had the Contract.

> **A.    Must the Plaintiffs-Creditors—as a Prerequisite to this Section 523(a) Nondischargeability Action—Establish Grounds to Pierce Bella Vita's Entity-Veil, Pursuant to Sections 21.223, 101.002 and 101.114 of the Texas Business Organizations Code? Or is the Joint and Several Liability Set Forth in the Arbitration Award—Based Upon Unspecified DTPA Violations—Dispositive of There Being a "Debt" of the Defendant-Debtor, for Purposes of Section 523(a)(2)(A) of the Bankruptcy Code?**

6.    Here, of course, the Defendant-Debtor was the manager and majority member of Bella Vita, an LLC.  Again, it was Bella Vita that contracted with the Plaintiffs-Creditors, not the Defendant-Debtor personally.  Pursuant to the Texas Business Organizations Code, managers and members of an LLC are generally not individually liable for the contractual debts of the LLC (nor those debts relating to contractual debts), ***unless*** there is a finding that the manager/member used the LLC to perpetrate an ***actual fraud*** on a creditor, primarily for the ***direct personal benefit*** of the member/manager.[187]  If there is, indeed, a finding of perpetration of an ***actual fraud*** on a

---

[186] *See generally Husky Int'l Elec., Inc. v. Ritz (In re Ritz)*, 832 F.3d 560, 562 (5th Cir. 2016) (on remand from the United States Supreme Court, in which the United States Supreme Court held that no misrepresentation is necessary to establish an "actual fraud" under section 523(a)(2)(A) of the Bankruptcy Code, the Fifth Circuit noted that the next necessary step in the dischargeability litigation was for the bankruptcy court to determine whether there was a basis under state law to determine that the Debtor, Ritz, was personally liable on the debt that his corporation, Chrysalis, owed to the plaintiff/creditor, Husky, because "if Ritz is not liable to Husky under Texas law, then there is no debt to discharge and the question of the deniability of a discharge under § 523(a)(2)(A) is moot.").

[187] *See collectively* TEX. BUS. ORGS. CODE ANN. § 21.223 (West 2017) (landmark legislation limiting the liability of a shareholder or affiliate of a corporation for the ***contractual*** obligations of a corporation (and obligations relating to or arising from the contractual obligations) except where a shareholder or affiliate caused the corporation to perpetrate an ***actual fraud*** on the creditor ***primarily for the direct personal benefit*** of the shareholder or affiliate); TEX. BUS. ORGS. CODE ANN. § 101.002 (West 2017) (providing that Tex. Bus. Orgs. Code § 21.223 is applicable to limited liability companies) & TEX. BUS. ORGS. CODE ANN. § 101.114 (West 2017) (providing that the general rule of limited

creditor primarily for the ***direct personal benefit*** of the member/manager, then the LLC's veil can be pierced so as to hold the member/manager personally liable on the contractual debt (or debts relating to the contractual debt)[188] owed to the defrauded creditor. Notably, this veil-piercing exercise is not necessary if a member/manager is "otherwise liable" to a particular creditor under an "other applicable statute."[189]

7.    The knee-jerk answer to the above-posed questions may seem to be an obvious "yes" there is a "debt" as to the Defendant-Debtor, and there is no need to engage in a veil-piercing analysis —simply because of:  (a) the terms of the Arbitration Award, and (b) its underlying basis (*i.e.,* the DTPA—which is an "other applicable statute" as contemplated by Texas Business Organizations Code section 21.225(2)).  As far as the terms of the Arbitration Award, as noted earlier, it imposed damages "jointly and severally" against Bella Vita ***and*** the Defendant-Debtor in favor of the Plaintiffs-Creditors.[190]  As far as the basis of the Arbitration Award, as also noted earlier, it stated that the "evidence supports both a breach of contract cause of action and a DTPA cause of action ***against Bella Vita***" and that the "economic damages are addressed as ***DTPA violations*** against ***both Bella Vita and Clem***."[191]  The Arbitration Award further stated that the

---

liability of members and managers afforded by Tex. Bus. Orgs. Code §§ 21.223 & 101.002 may be modified by specific provisions in a limited liability company's formation agreement).  *See also Spring Street Partners-IV, L.P. v. Lam,* 730 F.3d 427, 442-444 (5th Cir. 2013)*; McCarthy v. Wani Venture, A.S.,* 251 S.W.3d 573, 590 (Tex. App.— Houston [1st Dist.] 2007, pet. denied).

[188] *See generally* discussion in *Ward Family Found. v. Arnette (In re Arnette)*, 454 B.R. 663, 693 (Bankr. N.D. Tex. 2011) (noting that some courts have found that Texas Business Organizations Code section 21.223 applies to both contractual claims and torts ancillary to the underlying contract).  *But see Kwasneski v. Williams (In re Williams)*, Adv. No. 10-05077, 2011 WL 240466, at *1 (Bankr. W.D. Tex. Jan. 24, 2011) (noting that it is the general rule in Texas that corporate agents are individually liable for fraudulent or tortious acts committed while in the service of their corporation and it is not necessary to pierce the corporate veil in order to impose personal liability).

[189] TEX. BUS. ORGS. CODE ANN. § 21.225(2) (West 2017).

[190] *See* Plaintiffs-Creditors' Exhibit 12, pp. 3 & 4 (¶18 and "Award" paragraph).

[191] *Id.* at pp. 3-4 (¶ 20) (emphasis added).

"actions of Clem and Bella Vita, acting through Clem, violate the provisions of DTPA, and they are a producing cause of economic damage to the Tomlinsons."[192]

8.      To understand why the Defendant-Debtor was imposed with personal liability under the Arbitration Award—and why this court believes there is a question here as to the pertinence of the veil-piercing provisions of the Texas Business Organizations Code—one must dissect a bit both the DTPA and the Arbitration Award.  The relevant provisions of the DTPA are sections 17.46(b) (under the heading "Deceptive Trade Practices Unlawful") and section 17.50 (under the heading "Relief for Consumers").   First, under section 17.50(a) of the DTPA only a "consumer" has standing to maintain a private cause of action under these provisions of the DTPA. The Plaintiffs-Creditors were undeniably "consumers."[193]   Second, proving a violation of the DTPA requires a consumer to proceed down one of two different avenues.  Avenue number one is to show that a defendant committed one or more of a laundry list of 33 "false, misleading, or deceptive acts or practices" enumerated under section 17.46(b) that were relied upon by the consumer to his detriment (hereinafter, the "False, Misleading, or Deceptive Acts").[194]   An alternative avenue to prove a violation of the DTPA is for the consumer to show that a defendant committed one of three violations enumerated under section 17.50(a)(2) ("breach of an express or implied warranty"), section 17.50(3) ("any unconscionable action"), or section 17.50(4) ("violation of Chapter 541, Insurance Code") (hereinafter, the "Alternative DTPA Acts").[195] Under the DTPA, a consumer may bring suit against any "person" whose False, Misleading, or

---

[192] *Id.* at p. 3 (¶ 16).

[193] TEX. BUS. & COMM. CODE ANN. § 17.45(4) (West 2017).

[194] *See, collectively*, *id.* at §§ 17.46(b) and 17.50(a)(1).

[195] *Id.*

Deceptive Acts or Alternative DTPA Acts were the producing cause of the consumer's harm.[196] The DTPA broadly defines "person" as "an individual, partnership, corporation, association, or other group, however organized."[197] The Texas Supreme Court has concluded that officers or agents of an entity may be held personally liable under the DTPA, even though they were acting on behalf of the entity.[198] Finally, a consumer who prevails in a type of private action described herein may obtain "economic damages" but—if the trier of fact finds the conduct was committed "knowingly"—the consumer may obtain "mental anguish" damages (up to three times the amount of "economic damages"); if the trier of fact finds that the conduct was committed "intentionally," the consumer may recover up to another three times the amount of economic and mental anguish damages.

9.     As noted earlier in the discussion of collateral estoppel, the Arbitration Award is not a model of clarity (and very little in the way of a record from the Prepetition Arbitration was submitted into evidence). However, we know that the Plaintiffs-Creditors alleged, in their Second Amended Statement of Claims submitted to the Arbitration Panel, more than a half-dozen common law and statutory causes of action including at least the following: breach of contract/breach of warranty; negligence and malice/gross negligence; negligent misrepresentation; violations of approximately ten provisions of the DTPA—of which eight constituted False, Misleading, or Deceptive Acts and two constituted Alternative DTPA Acts; fraud and fraud in the inducement or by nondisclosure; fraud in a real estate transaction; unconscionable, knowing, or intentional course of action; conversion; and various other doctrines or remedies were pleaded (estoppel, alter ego,

---

[196] *Id.* at § 17.50(a)(1).

[197] *Id.* at § 17.45(3).

[198] *See Miller v. Keyser*, 90 S.W.3d 712, 717-18 (Tex. 2002); *Weitzel v. Barnes*, 691 S.W.2d 598, 601 (Tex. 1985).

and joint enterprise).  The Arbitration Award ultimately determined that there was evidence to sustain just a **breach of contract cause of action** and **unspecified DTPA violations** and the Arbitration Panel awarded economic damages jointly and severally against Bella Vita and the Defendant-Debtor for the DTPA violations.  The Arbitration Award states that the actions of Bella Vita and the Defendant-Debtor did "not constitute a knowing[199] violation of DTPA"—which seemed aimed at denying the Plaintiffs-Creditors any basis for receiving mental anguish/treble damages.  Again, the Arbitration Award never states what provisions of the DTPA were violated— were there False, Misleading, or Deceptive Acts or merely Alternative DTPA Acts?   The Arbitration Award **implies** that the following acts were determined to be violations of some unspecified provisions of the DTPA:  (a) promises by the Defendant-Debtor that "he would put a full-time superintendent and a full-time project manager" on the Plaintiffs-Creditors' project as well as James Stokey as a "personal liaison" and "[t]hese representations proved to be false"; (b) installing helical rather than concrete piers called for by the Contract plans and specifications without written approval from the Plaintiffs-Creditors; and (c) the Defendant-Debtor "represented that a builder's risk policy for the Residence had been purchased when in fact the purchase had not been made."  Again, there is no articulation of what provisions of the DTPA were found to be violated.  The Arbitration Award does state that claims of common law negligence and gross negligence were denied in that they were barred by the economic loss rule.  The Arbitration Award

---

[199] Although the Arbitration Award does not elaborate at all on the basis for this finding, Texas jurisprudence has articulated that "knowingly" means actual awareness, at the time of the act or practice complained of, of the falsity, deception, or unfairness of the act or practice giving rise to the consumer's claim . . . but actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness."  TEX. BUS. & COM. CODE ANN. § 17.45(9) (West 2017).  Actual awareness does not mean merely that a person knows what he is doing. *St. Paul Surplus Lines Ins. Co., Inc. v. Dal-Worth Tank Co., Inc.*, 974 S.W.2d 51, 53–54 (Tex. 1998). Rather, it means that a person knows what he is doing is false, deceptive, or unfair. *Id.* at 54.  Moreover, "actual awareness is more than conscious indifference to another's rights of welfare."  *Id. See also Daugherty v. Jacobs,* 187 S.W.3d 607, 618 (Tex. App.—Houston [14th Dist.] 2006).

also states that the claims of the Plaintiffs-Creditors "for misrepresentation, fraud, fraud in the sale of real estate, conversion, estoppel, alter ego, and joint enterprise were not sustained by a preponderance of the evidence and are, therefore, denied." As noted earlier in this ruling, it is unclear whether these causes of action were pursued and denied, or simply abandoned by Plaintiffs.

10.     In summary, all that is clear is that the Arbitration Panel believed that: (a) certain false statements and certain actions taken without the Plaintiffs-Creditors' written consent constituted unspecified DTPA violations—for which both Bella Vita and the Defendant-Debtor should be held jointly and severally liable; and (b) only economic damages should be awarded—not mental anguish damages—because the Arbitration Panel was not persuaded that "knowing" violations of the DTPA had occurred.

11.     With this backdrop, the court struggles somewhat in determining whether the Plaintiffs-Creditors should be required to pierce the entity-veil of Bella Vita here, pursuant to Texas Business Organizations Code section 21.223, in order for this court to find a "debt" owing by the Defendant-Debtor to the Plaintiffs-Creditors that may, in turn, be nondischargeable. On the one hand, ***section 21.225 explicitly recognizes that, if there is a statutory basis to hold a member/manager liable for an LLC obligation to a creditor, then section 21.223 does not apply***. The DTPA may just be that statutory basis here.[200] On the other hand, this court earlier determined, in the collateral estoppel discussion herein, that the arbitral findings were not worth all that much weight in this Adversary Proceeding, since it was so unclear what had actually been "fully and

---

[200] *See TecLogistics, Inc. v. Dresser-Rand Group, Inc.*, 527 S.W.3d 589, 601 (Tex. App—Houston [14th Dist.] 2017, no pet.) (explaining in dicta that even if 21.223 bars liability that might otherwise be imposed under the common law, the statute provides no protection from liability imposed by another statute and citing to the DTPA as one of those statutes).

vigorously litigated" and was likewise unclear whether the Arbitration Panel "*made specific, subordinate, factual findings on the identical dischargeability issue in question.*" Is it correct for this court *not* to apply collateral estoppel in one context (because of a dearth of explanation regarding what was really litigated and found by the Arbitration Panel and what was not), but apply collateral estoppel in another context (*i.e.,* for purposes of personal liability imposed on the Defendant/Debtor under the DTPA)—when it is not clear what DTPA provisions were even violated? The court has been cited no authority on this point and has not been able to find any authority independently that presents a clear answer.

12. On balance, the court believes that the Arbitration Award, imposing personal liability on the Defendant-Debtor pursuant to *some* provision of the DTPA—albeit an unspecified provision—makes the situation at bar fall within the ambit of section 21.225 of the Texas Business Organizations Code and, thus, there is an "applicable statute" that makes the Defendant-Debtor liable on a "debt" of the LLC. Thus, the court simply needs to analyze: (1) whether some portion of the "debt" owed by the Defendant-Debtor (pursuant to the Arbitration Award) constitutes a debt for money obtained by false pretenses, a false representation, or actual fraud; and (2) whether such debt is, therefore, nondischargeable pursuant to section 523(a)(2)(A)'s legal standards.

**B.    What are the False Pretenses, False Representations, or Actual Fraud That Occurred?**

*1.    The Plaintiffs-Creditors' Fraud Claim.*

13. In their First Amended Complaint, the Plaintiffs-Creditors have asserted damages based upon certain misrepresentations made by the Defendant-Debtor in the form of a common law fraud claim. In order to assert a claim for fraud under Texas law, the Plaintiffs-Creditors must prove that: (1) a material misrepresentation was made that was false; (2) that was either known to be false when made or was asserted without knowledge of its truth; (3) that was intended to be

acted upon; (4) that was relied on; and (5) that caused injury.[201] It is important to note that many of the representations complained of by the Plaintiffs-Creditors are included as actual terms of the Contract with Bella Vita. While as a general rule, the failure to perform the terms of a contract would be a breach of contract action (not an action for the tort of fraud), a contractual promise can be actionable as fraud if the contractual promise is made with the intent at the time not to perform.[202] Thus, a present intent not to perform is the essential ingredient to making a promise to perform in the future actionable, and intent not to perform may be measured from a party's subsequent acts after the promise is made.[203] Intent is a fact question uniquely within the realm of the trier of fact because it largely depends upon the credibility of the witnesses and the weight to be given to their testimony.[204] Moreover, since the intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence.[205]

14. Additionally, to the extent there is not an ***actual*** material misrepresentation at issue, but rather ***silence*** or ***concealment*** by a party, fraud may, nonetheless, still be present under a fraud by nondisclosure cause of action. Fraud by non-disclosure is a subcategory of fraud because, where a party has a duty to disclose, the non-disclosure may be as misleading as a positive misrepresentation of the facts.[206]

---

[201] *Amouri v. S.W. Toyota, Inc.*, 20 S.W.3d 165, 168 (Tex. App.—Texarkana 2000, pet. denied); *Formosa Plastics Corp. USA v. Presidio Eng'rs. & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998).

[202] *New Process Steel Corp., Inc. v. Steel Corp. of Tex., Inc.*, 703 S.W.2d 209, 214 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.); *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986) ("A promise to do an act in the future is actionable fraud when made with the intention, design and purpose of deceiving, and with no intention of performing the act.").

[203] *Id.*

[204] *Id.*

[205] *Id.* at 435.

[206] *Metz v. Bentley (In re Bentley)*, 531 B.R. 671, 688 (Bankr. S.D. Tex. 2015).

15.     In order to prove fraud by nondisclosure, the Plaintiffs-Creditors must show that the Defendant-Debtor: (1) concealed or failed to disclose a material fact within his knowledge; (2) knew that the Plaintiffs-Creditors were ignorant of the fact and did not have an equal opportunity to discover the truth; (3) intended to induce the Plaintiffs-Creditors to take some action by concealing or failing to disclose the fact, and (4) the Plaintiffs-Creditors suffered injury as a result of acting without knowledge of the undisclosed fact.[207]   As a general rule, a failure to disclose information does not constitute fraud unless there is *a duty to disclose the information*.[208]   Thus, silence may be equivalent to a false representation only when the particular circumstances impose a duty on the party to speak and the party deliberately remains silent.[209]   Whether such a duty exists is a question of law.[210]   In applying Texas law, the Fifth Circuit has held that a duty to disclose may arise in four situations: (1) when there is a fiduciary relationship; (2) when one voluntarily discloses information, the whole truth must be disclosed; (3) when one makes a representation, new information must be disclosed when that new information makes the earlier representation misleading or untrue; and (4) when one makes a partial disclosure and conveys a false impression.[211]

---

[207] *Rawhide Mesa-Partners, Ltd. v. Brown McCarrol, L.L.P.*, 344 S.W.3d 56, 60 (Tex. App.—Eastland 2011, no pet.) (citing to *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001)).

[208] *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998).

[209] *SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 353 (Tex. 1995); *Smith v. Nat'l Resort Cmtys., Inc.*, 585 S.W.2d 655, 658 (Tex. 1979).

[210] *Ralston Purina Co. v. McKendrick*, 850 S.W.2d 629, 633 (Tex. App.—San Antonio 1993, writ denied).

[211] *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 481 (5th Cir. 2000) (citing to *Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex. App.—Houston [14th Dist.] 1997, pet. denied)).  *See also Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 341 (5th Cir. 2008) (a duty to disclose may arise "where one makes a representation and fails to disclose new information that makes the earlier representation misleading or untrue . . . ."); *Rimade v. Hubbard Enters.*, 388 F.3d 138, 143 (5th Cir. 2004) (holding that a duty to disclose can arise by operation of law or by agreement of the parties, or by some special relationship between the parties, such as a fiduciary or confidential relationship; notwithstanding the above, the Fifth Circuit reiterated that there is always a duty to correct one's own prior false or misleading statements, such that a speaker making a partial disclosure assumes a duty to tell the whole truth even when the partial disclosure was not legally required; finally, the Fifth Circuit noted that there was also a duty to speak when one party

16.     The Plaintiffs-Creditors assert that the Defendant-Debtor made numerous material false representations with the intent of deceiving the Plaintiffs-Creditors.   Specifically, the Plaintiffs-Creditors allege that the Defendant-Debtor's misrepresentations include, but are not limited to:

a.  Misrepresenting that the Defendant-Debtor's company was qualified to perform the work under the contract with the Plaintiffs-Creditors;
b.  Misrepresenting that the work would be performed in a good and workmanlike manner;
c.  Misrepresenting that the work would be performed in accordance with first-class custom home building practices;
d.  Misrepresenting that the work would be in compliance with design plans;
e.  Misrepresenting the source of the design plans;
f.  Misrepresenting that a Builder's Risk Policy was in place on the Plaintiffs-Creditors' project, and charging the Plaintiffs-Creditors for the same;
g.  Misrepresenting that the Plaintiffs-Creditors' upfront payment of ten percent (10%) of the total contract price would go only towards the Plaintiffs-Creditors' project;
h.  Misrepresenting the quality of materials that would be used on the Plaintiffs-Creditors' project;
i.  Misrepresenting that a full-time superintendent and full-time project manager would be on the project;
j.  Misrepresenting that the Plaintiffs-Creditors would have a personal liaison to coordinate design selections;
k.  Misrepresenting that subcontractors working on the Plaintiffs-Creditors' project were being paid; and
l.  Misrepresenting that the Plaintiffs-Creditors would receive lien releases for work performed by subcontractors.

17.     Parsing through these misrepresentations individually, the court first believes that there was no evidence presented by the Plaintiffs-Creditors regarding misrepresentations (e), (k) and (l), so these representations are not actionable.[212]

---

voluntarily discloses some but less than all material facts, so that he must disclose the whole truth (*i.e.*, material facts, lest his partial disclosure convey a false impression)); *Lewis v. Bank of Am. NA*, 347 F.3d 587, 588 (5th Cir. 2003), *cert. denied*, 343 F.3d 540 (2004) ("A duty to speak arises by operation of law when . . . one party voluntarily discloses some but less than all material facts, so that he must disclose the whole truth, *i.e.*, all material facts, lest his partial disclosure convey a false impression.").

[212] As to representations (k) and (l), while there were two exhibits admitted into evidence that alluded to the fact that there may have been unpaid subcontractors on the project, there was no testimony regarding these exhibits, and the court cannot discern by just examining the exhibits whether that was dispositive of the issue.  *See* Plaintiffs-Creditors'

18.     Next, misrepresentations (a), (b), (c), and (h) are also not actionable here.  Most of these alleged misrepresentations address the Defendant-Debtor's qualifications as a custom home builder and his obligation to perform the work in a good and workmanlike manner, in accordance with first class custom home building practices and using quality materials.  Specifically, the court does not believe that the evidence shows that these representations were "false" or ***a promise of some future performance made with the intent not to perform***, both of which are requirements to prove common law fraud.[213]  Here, the court believes that the evidence—specifically the testimony of the Defendant-Debtor—demonstrates that the alleged misrepresentations listed above were "mostly true" when made, but, if not, were intended to be performed by the Defendant-Debtor at the time they were made.  Moreover, the court does not believe that the Plaintiffs-Creditors presented evidence that any of the materials utilized by Bella Vita were poor quality, but rather that they were not the material specifically approved by the Plaintiffs-Creditors.  Because of this evidence, the court does not believe that these alleged misrepresentations would qualify as actual "misrepresentations" rising to the level of fraud under Texas law and, accordingly, are not actionable.

19.     Next, the court finds that representation (j) (that **the** Plaintiffs-Creditors would have a personal liaison to coordinate design selections) is also not actionable due to the presence of the "entireties clause" in the Contract.  First, to be clear, representation (j), while indeed promised by the Defendant-Debtor to the Plaintiffs-Creditors prior to the Contract being signed, never was

---

Exhibit 6 (Text Messages between Mrs. Tomlinson & Paul Holland) & Plaintiffs-Creditors' Exhibit 13.110 (Email from Chase White to Josh Van, regarding invoice from the City of Westlake).

[213] *Eagle Props., Ltd. v. Scharbauer*, 807 S.W.2d 714, 723 (Tex. 1990) (emphasis added).

actually incorporated into the Contract and related documents.  Paragraph 26 of the Contract provides that

> This Contract and the attached addenda, constitutes the entire agreement between the parties and all prior negotiations, promises and/or representations whether oral or written, not expressly set forth herein, are of no force and effect and do not constitute part of this Contract.  Owner represents to Builder that Owner has not relied and is not relying upon any warranties, promises, guaranties, or representations made by Builder, any agent of Builder, or any third party or anyone else acting or claiming to act on behalf of Builder with respect to the purchase of the Property, except as contained in this Contract. . . .

This was quite clearly an entireties clause.  Under Texas law, the presence of an entireties clause can have the effect of disclaiming any **reliance** a contract party may have had on any representations made by a counter-party to the contract prior to the contract being signed, as long as the disclaimer in the contract language is **"clear and unequivocal"** in its expression of the parties' intent to disclaim reliance.[214]  By way of example, the Texas Supreme Court has held that there was an intent to disclaim reliance where the contract provided, "[N]one of us is relying upon any statement or representation of any agent of the parties being released hereby. Each of us is relying on his or her own judgment . . . ."[215]  In *Italian Cowboy Partners*, the Texas Supreme Court noted that this form of disclaimer of reliance "was evident from the language of the contract itself."[216]

---

[214] *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am*, 341 S.W.3d 323, 331, 336, 337 n.8 (Tex. 2011) (stating that there is a need "to protect parties from unintentionally waiving a claim for fraud," that clarity of the disclaimer is a "requirement" for its enforceability, and that only when a disclaimer is "clear and unequivocal" does analysis "then proceed" to the contract's circumstances); *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 179 (Tex. 1997) (holding that disclaimer-of-reliance clause had "requisite clear and unequivocal expression of intent necessary to disclaim reliance").

[215] *Id.* at 180.  *See also Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 54 (Tex. 2008) (finding disclaimer of reliance where the contract stated that "in executing the releases contained in this Agreement, [the parties are not] relying upon any statement or representation of any agent of the parties being released hereby. [We are] relying on [our] own judgment").

[216] *Italian Cowboy*, 341 S.W.3d at 335.

20.     Here, the court finds that a plain reading of the language above from the Contract also shows a clear and unequivocal disclaimer of reliance.[217] Why is this critical?  To the extent that there was a representation made by the Defendant-Debtor prior to the Contract being signed that was not actually incorporated into the Contract, the Plaintiffs-Creditors effectively waived any reliance on such representation being performed.  As previously stated, ***reliance of the Plaintiffs-Creditors*** on the representation made is a requirement to prove common law fraud under Texas law.  Any reliance the Plaintiffs-Creditors would have had on such representation being performed by the Defendant-Debtor would have been disclaimed pursuant to paragraph 26 of the Contract. Accordingly, because there is no reliance of the Plaintiffs-Creditors that the representation would be performed, the Plaintiffs-Creditors' fraud claim as to alleged misrepresentation (j) fails.

21.     In summation, the only alleged misrepresentations that now remain are that: (1) "the work would be in compliance with the design plans;" (2) "that Plaintiffs-Creditors' upfront payment of ten percent (10%) of the total contract price would go only towards Plaintiffs-Creditors' project;" (3) "that a full-time superintendent and full-time project manager would be on the project;" and (4) that "a Builder's Risk Policy was in place on the Plaintiffs-Creditors' property, and charging the Plaintiffs-Creditors for the same."

---

[217] The Texas Supreme Court also noted in *Forest Oil* (which was decided prior to *Italian Cowboy*) that courts should not only examine the contract itself, but also the totality of the surrounding circumstances when determining if a waiver-of-reliance provision is binding.  Those factors include: (1) whether the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute; (2) whether the complaining party was represented by counsel; (3) whether the parties dealt with each other in an arm's length transaction; (4) whether the parties were knowledgeable in business matters; and (5) whether the release language was clear. *Forest Oil*, 268 S.W.3d 51, 60 (Tex. 2008).  Here, the court notes that the factors outlined above were also all present in this case.  Specifically, the Contract was thoroughly negotiated by the parties, and the Plaintiffs-Creditors were represented by an attorney, Mr. Miller.  Mrs. Tomlinson had some prior experience in building a custom home and seemed very knowledgeable and sophisticated regarding how the construction process generally worked, and the language in paragraph 26 of the Contract was clear regarding the Plaintiffs-Creditors' disclaimer of reliance.

22.     Turning now to the evidence before the court, and keeping in mind the required elements to prove fraud under Texas law outlined above, the court believes that three of the four alleged misrepresentations above form the basis for an ultimate finding of fraud or fraud by nondisclosure committed by the Defendant-Debtor.

<u>a.</u>      <u>Representation 1: "the work would be in compliance with the design plans."</u>

23.     First, as to the representation that "the work would be in compliance with the design plans," the evidence showed that the initial design plans submitted to the Plaintiffs-Creditors contemplated the installation of concrete piers and, in fact, that was the pier type that Bella Vita first attempted to install.   However, upon discovering subsurface water, Bella Vita decided to change the pier type to steel helical piers, without timely disclosing this to the Plaintiffs-Creditors or obtaining their consent to the change, as required under the terms of the Contract.   Clearly, this amounted to a breach of the Contract.   Specifically, the Contract at paragraph 7.A.3, last sentence, stated that "Builder shall make no changes to the Improvements or alterations from the Construction Documents executed by Owner, **_unless agreed in writing by Owner, at Owner's sole and exclusive option_**."[218]   Furthermore, the Contract at paragraph 7.A.5 (last paragraph) stated that "If Builder discovers that changes or corrections are necessary for any of the foregoing reasons [one of such foregoing reasons being "unusual subsurface soil conditions, topography, or ground water"], **_Builder will promptly notify owner_**."[219]   Additionally, the Contract at paragraph 9.C. provided that the Builder agrees to build the Home "in accordance with first-class, custom home industry standard building practices . . . and otherwise substantially in compliance with the Final

---

[218] *See* Plaintiffs-Creditors' Exhibit 1, ¶ 7.A.3. (emphasis added).

[219] *See* Plaintiffs-Creditors' Exhibit 1, ¶ 7.A.5 (emphasis added).

Plans and the Construction Documents, including, without limitation, the customer selection sheet and customer change orders, if any.  However, Owner agrees Builder may substitute materials of similar quality, ***but only with the prior written consent of Owner.***"[220]  Finally, Paragraph 9.E. of the Contract added (last sentence) that, "Builder reserves the right to make changes in the plans, specifications, materials, and components being used at the time of purchase, ***but only with prior written consent of Owner.***"[221]  Thus, the Contract clearly required Bella Vita to inform the Plaintiffs-Creditors of any changes to the pier type, and the Defendant-Debtor was well aware of this requirement since he was the one who actually signed the Contract.  Moreover, this was a material term of the Contract, as Mrs. Tomlinson credibly testified that the Tomlinsons had problems with prior builders and they wanted "the builder to follow these plans, and if you're not following these plans, we want to know it and approve it."[222]

24.    While the Defendant-Debtor has argued that his actions merely amounted to a breach of the Contract by Bella Vita (mainly breach of the requirement to obtain the approval of the Plaintiffs-Creditors of any changes to the Home design), the court concludes that the evidence presented demonstrates something more—specifically a fraud by nondisclosure ***during the performance of the Contract*** that induced the Tomlinsons to continue on with the Contract longer than they would have, had they known the truth.  Specifically, there was a significant gap in time between: (a) when the subsurface water was discovered on the Lots, (b) followed by the unilateral decision to change the pier type, (c) followed by the puncturing of the water line with the unapproved piers, which seriously flooded the Tomlinsons' building pad, and (d) ultimately

---

[220] *See* Plaintiffs-Creditors' Exhibit 1, ¶ 9.C. (emphasis added).

[221] *See* Plaintiffs-Creditors' Exhibit 1, ¶ 9.E. (emphasis added).

[222] *See* Transcript, p. 137.

confirming to the Plaintiffs-Creditors all these events (after the Tomlinsons learned from a neighbor that something seemed amiss). There was no credible testimony offered by the Defendant-Debtor to adequately explain why he chose not to inform the Plaintiffs-Creditors about the discovery of subsurface water; the decision to change piers; and the puncturing of a water line causing massive damages.

25.     Applying the specific requirements for a fraud by nondisclosure to the evidence above, the court finds that (1) the Defendant-Debtor concealed or failed to disclose the change in pier type to the Plaintiffs-Creditors (as well as the significant events preceding and following pier installation), which was a material fact within the Defendant-Debtor's knowledge; (2) the Defendant-Debtor knew that the Plaintiffs-Creditors were ignorant of the change in pier type (and surrounding events) and did not have an equal opportunity to discover the change; (3) by failing to disclose the change in pier type (and surrounding events), the Defendant-Debtor intended to induce the Plaintiffs-Creditors to stay in the Contract and continue paying for subsequent draw requests; and (4) the Plaintiffs-Creditors suffered injury as a result of the concealment of the change in pier type, mainly in having to remove and repair the damage from the unapproved helical piers (more on this below).

26.     As stated above, fraud by nondisclosure also requires a duty to disclose. Here, the court finds that a duty to disclose arose from the fact that there had been previous representations by the Defendant-Debtor to the Plaintiffs-Creditors that a specific pier type (*i.e.*, concrete piers) would be used in the construction of the Home. Bella Vita proceeded to expend the Tomlinsons' Initial Deposit and requested additional funds from the Plaintiffs-Creditors in order to (among other things) purchase these concrete piers.[223] Once the Defendant-Debtor knew that there was

---

[223] *See* Plaintiffs-Creditors' Exhibit 40 & Defendant-Debtor's Exhibit 6.

going to be a change to the pier type, the Defendant-Debtor was under a duty to inform the Plaintiffs-Creditors of this change. One needs to consider the overall circumstances. This was not just a simple change in generic building materials. The nondisclosure was a combination of: (a) Bella Vita and its subcontractors encountering subsurface water of which they had reason to be aware; (b) Bella Vita deliberating with engineers and vendors and deciding to make a major change—one that the Tomlinsons ultimately would not feel comfortable with and one which the Bella Vita engineer (Eric Davis) later refused to discuss with them; (c) Bella Vita changing to helical piers, then puncturing a water line while installing one; and (d) never disclosing any of this until Mrs. Tomlinson started asking questions. As noted above, Texas courts have held "when one makes a representation, new information must be disclosed when the new information makes the earlier representation misleading or untrue." In other words, there is a duty to speak that arises by operation of law. Here, once the Defendant-Debtor knew that there would be a change in the pier type after consulting with the engineer, Eric Davis, the Defendant-Debtor had a duty to disclose the new information to the Plaintiffs-Creditors.[224]

27. To be clear, the court is not finding that there was a fraudulent misrepresentation at the time the Contract was entered into—as to the contractual provisions that the "work would be in compliance with design plans" or as to the provisions that written consent would be obtained for changes. The court is not concluding that the Defendant-Debtor *intended* not to comply with these Contract representations when they were made. Rather, the court is concluding that the Defendant-Debtor, during the performance of the Contract, intentionally concealed material facts

---

[224] The court also notes an email that was sent from Mike Moss to the Plaintiffs-Creditors on July 20, 2015 that referenced installation of the "piers", without referencing that the concrete piers originally required by the Contract's design plans were being changed to helical piers. The court believes that this also amounted to "a partial disclosure conveying a false impression" (*see Lewis*, 347 F.3d at 588) of what was really going on with the piers and this may have also triggered a duty to inform the Plaintiffs-Creditors about the change in the pier type.

from the Tomlinsons, knowing they were unaware, with the intention of inducing the Tomlinsons to stay in the Contract. The Defendant-Debtor does not refute that he was personally involved (as CEO) in the entire pier switch and water puncturing fiasco. The court believes that the Defendant-Debtor cared **_mightily_** about not losing a $4.5 million contract with a famous NFL star on the biggest home that he had ever contracted to build. This project would be the biggest accomplishment of his young career.

28. As far as the damages for this fraud by nondisclosure, the court notes that the Plaintiffs-Creditors relied solely upon the damages set forth in the Arbitration Award as proof of their damages, and the Defendant-Debtor did not present any evidence to refute such amounts.[225] The Arbitration Award awarded damages of $169,875 for the "charge for the helical piers" as well as $30,300 for the "removal of the helical piers" (which new engineers recommended to the Tomlinsons). The Arbitration Award also found that "as a result of the installation of the helical piers and as a result of the punctured water line, the building pad must be torn out and replaced . . . [and a] reasonable and necessary cost to do this work is $235,000.00." Thus, the Plaintiffs-Creditors are also entitled to a total damage award of $435,175 ($169,875 plus $30,300 plus $235,000) for the nondisclosure of the change in the pier type.

> **b.** **_Representation 2: "that Plaintiffs-Creditors' upfront payment of ten percent (10%) of the total contract price would go only towards the Plaintiffs-Creditors' project."_**

29. Second, as to the alleged representation made by the Defendant-Debtor "that the Plaintiffs-Creditors' upfront payment of ten percent (10%) of the total contract price would go only towards the Plaintiffs-Creditors' project," the court concludes that there was an utter failure to disclose how the upfront payment was spent. This was material, and within the Defendant-

---

[225] *See* Plaintiffs-Creditors' Exhibit 12.

Debtor's knowledge. The Defendant-Debtor knew the Tomlinsons were unaware of and did not have an opportunity to otherwise discover it. And by failing to disclose, the Defendant-Debtor intended to induce the Tomlinsons to stay in the Contract. This caused harm to the Tomlinsons.

30. The Contract clearly stated that draw requests *with copies of invoices* (among other documentation) were required—plain and simple. Second, paragraph 6 dealing with the "escrow" of the initial 10% deposit clearly contemplated that Bella Vita would retain it and "apply it against the first approved Draw Request." However, after the Contract was signed, Bella Vita repeatedly failed to fully account for the Initial Deposit, even after repeated requests from Mrs. Tomlinson. Specifically, the court makes note of at least two or three cost-reconciliations that were sent to the Plaintiffs-Creditors, in which there was a failure to fully account for where the Initial Deposit was actually spent (despite previously representing to the Plaintiffs-Creditors in prior draw requests that the entire Initial Deposit had been expended on "soft costs").[226]

31. The argument made vociferously by the Defendant-Debtor is that the Contract was a "fixed price" contract—as though nothing he sent or did not send to the Plaintiffs-Creditors—as far as how their deposit and subsequent draw money was spent—really mattered. However, this defense does not adequately take into account the true nature of the Contract for at least two reasons. First, the Contract did have some mechanisms for cost adjustments—upward or conceivably downward. Second, while no "trust fund" mechanisms/protections were put in place, there were oversight and approval mechanisms that were clearly intended to ensure that the Plaintiffs-Creditors could monitor where their money was being spent and make sure it did not go toward any of the Defendant-Debtor's other projects. This would be a rational concern for any consumer building a house, and Mrs. Tomlinson credibly testified that bad experiences with prior

---

[226] *See* Plaintiffs-Creditors' Exhibit 5, 13-109 & Defendant-Debtor's Exhibit 6.

house-building projects were what made her retain a lawyer (Mr. Miller) to negotiate special oversight mechanisms into the Contract. Moreover, the Defendant-Debtor also testified that the Plaintiffs-Creditors "had been burned" by other builders in the past and that he knew the Plaintiffs-Creditors "wanted transparency in the visibility of the cost."[227]

32.     The failure to comply with the Contract's requirements to provide invoices and other documentation to the Plaintiffs-Creditors regarding expenditures on their Home project was not only a breach of contract but also, in this court's view, based on the totality of the credible evidence, slipped into the category of a fraudulent nondisclosure. Once again, to be clear, the court is not finding that there was a fraudulent intent at the time of entering into the Contract that Bella Vita would not disclose how the Tomlinsons' Initial Deposit and other funds would be spent. Rather, the court is concluding that, during the performance of the Contract, the Defendant-Debtor personally participated in concealing how the Tomlinsons' funds had been spent with the intention of inducing his famous clients to stay in the lucrative Contract. This court strongly suspects, from the continuous concealment and the Defendant-Debtor's obtuse answers at Trial, that some of the Tomlinsons' funds were used for purposes other than their Home—since no genuine "escrow" was ever actually established.

33.     The Plaintiffs-Creditors must show, of course, that there was a duty to disclose in order for this to be an actionable fraud by nondisclosure against the Defendant-Debtor. As noted above, Texas courts have held that there is a duty to disclose "when one makes a partial disclosure and conveys a false impression." Here, such a duty clearly existed in light of the fact that the first two draw requests showed that the Initial Deposit had been completely utilized on "soft costs," creating a false impression that the Initial Deposit had actually been spent on the Plaintiffs-

---

[227] *See* Transcript, pp. 62-63.

Creditors' home. Yet, in the subsequent reconciliations produced by the Defendant-Debtor, it became clear that the Defendant-Debtor was unable to account for a significant portion of the Initial Deposit. Thus, the Defendant-Debtor was clearly under a duty to disclose to the Plaintiffs-Creditors how he had or had not spent the Initial Deposit.

34. What would be the resulting actual damages owed to the Plaintiffs-Creditors for this nondisclosure? In looking at the various cost breakdowns that were submitted into evidence at the Trial, as well as the testimony of the Defendant-Debtor, Mrs. Tomlinson, and the Defendant-Debtor's father, the most logical amount this court can derive is $207,000. This represents the amount of the subsequent draw requests ($68,310 plus $138,690) that the Plaintiffs-Creditors paid, based on a belief that their Initial Deposit had all been expended. In fact, there was a failure to disclose how as much as $215,418 of the Initial Deposit was even spent.[228] To this day, the Defendant-Debtor has failed to disclose how these funds were or were not spent. The mystery looms. Accordingly, the court believes that $207,000 represents the damages Plaintiffs-Creditors are entitled to against the Defendant-Debtor for failing to fully account for how the Initial Deposit was spent.

    c.    *Representation 3: "that a full-time superintendent and full-time project manager would be on the project."*

35. As to the third representation "that a full-time superintendent and full-time project manager would be on the project," the evidence showed that there was not a Bella Vita representative (*i.e.*, a manager or superintendent) on site full-time after the Contract was signed. Specifically, Mrs. Tomlinson credibly testified that on the day the water line was punctured at the

---

[228] *See* Defendant-Debtor's Exhibit 6. While Plaintiffs-Creditors' Exhibit 13-109 fails to account for a lesser amount ($200,042), there was not enough credible evidence presented by the Defendant-Debtor to show that Mrs. Tomlinson actually received this "final" reconciliation.

Lots, Chase White, who was supposed to be the full-time superintendent on the project, was not at the Lots because he was at another home around the corner being built by Bella Vita when the water line was punctured.[229]   Additionally, Mrs. Tomlinson also credibly testified that it was important to them to have someone full-time on their project because this was the biggest home that Bella Vita had ever built.[230]   While this representation turned out to be unfulfilled and there was a breach of contract, the court concludes it did not rise to the level of a "fraudulent misrepresentation" or "fraud by nondisclosure."

> _d._      _Representation 4: "a Builder's Risk Policy was in place on the Plaintiffs-Creditors' property, and charging the Plaintiffs-Creditors for the same."_

36.      Finally with regard to the representation that "a Builder's Risk Policy was in place on the Plaintiffs-Creditors' property, and charging the Plaintiffs-Creditors' for the same," the court believes that a fraudulent misrepresentation occurred.  Once again, the court is not concluding that the Defendant-Debtor misrepresented at the time of contracting that Bella Vita would purchase the Builder's Risk Policy, while secretly intending not to do it.   Rather, the Defendant-Debtor personally supervised reports going out to the Tomlinsons during the performance of the Contract that created the false impression that $22,415.93 of the Tomlinsons' money had been used to acquire a Builder's Risk Policy.

37.      The Defendant-Debtor testified that a builder's risk policy was a policy that would originate and be paid for once the "lumber dropped" on the home and, since the Plaintiffs-Creditors' construction project never got to that stage, the Defendant-Debtor testified that the builder's risk policy was never purchased.  However, to be clear, there is documentary evidence

---

[229] _See_ Transcript, p. 172.

[230] _Id._

in the record showing that the Defendant-Debtor did represent to the Plaintiffs-Creditors on multiple occasions that ***Bella Vita had, in fact, purchased the builder's risk insurance policy and paid for the builder's risk insurance policy***.  Specifically, the evidence showed that there were cost-reconciliations sent to Mrs. Tomlinson on June 4, 2015 and August 6, 2015, and that both cost-reconciliations represented that $22,415.93 had been spent on a builder's risk policy for the Home, when, in fact, one had not been purchased.[231]  All attempted explanations of the Defendant-Debtor and his father regarding why an unpurchased builder's risk policy was placed on cost reports sent to the Tomlinsons fell flat.  Based on the Defendant-Debtor's testimony that this policy was, in fact, never purchased, the court finds that Bella Vita, through the Defendant-Debtor, committed fraud by misrepresenting that the builder's risk policy had, in fact, been purchased, and accordingly, the Plaintiffs-Creditors are entitled to damages in the amount of $22,415.93 (the line item amount for such policy in the various cost reconciliations provided to the Plaintiffs-Creditors).

38.     In sum, the court finds that the Plaintiffs-Creditors are entitled to damages in the amount of $664,590.93 ($435,175 plus $207,000 plus $22,415.93) for the various fraudulent misrepresentations and nondisclosures made to the Plaintiffs-Creditors in this case and that the Defendant-Debtor (for the reasons articulated above) is personally liable to the Plaintiffs-Creditors for this debt, pursuant to the application of section 21.225 of the Texas Business Organizations Code (and the resulting application of the DTPA).

---

[231] *See* Plaintiffs-Creditors Exhibit 5 & Defendant-Debtor's Exhibit 6.  The court also notes this same charge also appears on a subsequent cost-reconciliation provided by the Defendant-Debtor, however, the evidence is unclear whether or not Mrs. Tomlinson actually received this cost-reconciliation.  *See* Plaintiffs-Creditors' Exhibit 13-109.

> 2.    *Is the Plaintiffs-Creditors' Debt as to the Defendant-Debtor Nondischargeable Pursuant to Section 523(a)(2)(A) of the Bankruptcy Code?*

39.    In order to prove that a debt is nondischargeable, because it was obtained through "*a false representation,*" pursuant to section 523(a)(2)(A) of the Bankruptcy Code, a creditor must show that: (1) the debtor made representations other than a statement concerning his financial condition, (2) at the time the debtor made the representations, he knew they were false, (3) the debtor made the representations with the intention and purpose to deceive the creditor, (4) the creditor justifiably relied on such representations,[232] and (5) the creditor sustained losses as a proximate result of the false representations.[233]    Moreover, "when one has a duty to speak, both concealment and silence can constitute fraudulent misrepresentation; an overt act is not required."[234]    Misrepresentations may also be made through conduct.[235]    However, "[d]ebts falling within the ambit of section 523(a)(2)(A) are those obtained by fraud 'involving moral turpitude or intentional wrong, and any misrepresentations must be knowingly and fraudulently made.'"[236]    An intent to deceive may be inferred from a "reckless disregard for the truth or falsity of the statement combined with sheer magnitude of the resultant misrepresentation."[237]    Nevertheless, an honest

---

[232] In evaluating a cause of action under section 523(a)(2)(A) of the Bankruptcy Code, the court must determine that the plaintiff justifiably relied upon the representations made by the defendant. *Mullen v. Jones (In re Jones)*, 445 B.R. 677, 721 (Bankr. N.D. Tex. 2011) (citing to *Field v. Mans*, 516 U.S. 59, 74–75 (1995)).    Justifiable reliance does not require independent investigation of the facts as presented, but a plaintiff may not blindly rely upon a misrepresentation, the falsity of which would be obvious to the plaintiff had he used his sense to make a cursory examination.    *Jones*, 445 B.R. at 721 (citing to *Field*, 516 U.S. at 69–71).    Justifiable reliance is not a "reasonable man" standard, but is a lesser standard than reasonable reliance (which is a statutory element of section 523(a)(2)(B) of the Bankruptcy Code).    *Jones*, 445 B.R. at 721 (citing to *Field*, 516 U.S. at 77).

[233] *In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005); *RecoverEdge L.P.*, 44 F.3d at 1293.

[234] *AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 404 (5th Cir. 2001).

[235] *Id.*

[236] *Provident Bank v. Merrick (In re Merrick)*, 347 B.R. 182, 186 (Bankr. M.D. La. 2006) (citing *In re Martin*, 963 F.2d 809, 813 (5th Cir. 1992)).

[237] *Acosta*, 406 F.3d at 372.

belief, even if unreasonable, that a representation is true and that the speaker has information to justify it does not amount to an intent to deceive.[238]

40. A debt may also be nondischargeable under section 523(a)(2)(A) on the basis of "false pretenses." Often times, courts use the terms "fraudulent representation" and "false pretenses" interchangeably. However, the Supreme Court in *Husky* clearly recognized a distinction between the various types of fraud set forth in section 523(a)(2)(A) (namely "false representations" and "actual fraud"), and several courts have clearly recognized a distinction between a "false representation" and "false pretenses." For purposes of interpreting section 523(a)(2)(A) of the Bankruptcy Code, courts have generally defined "false pretenses" as written or oral misrepresentations, or conduct which creates or fosters in the proposed lender or creditor a "false impression" and can include "conduct and material omissions."[239] "False pretenses" can also be defined as "any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor."[240]

41. Turning now to the credible evidence, the court ultimately concludes that the Plaintiffs-Creditors' fraud claims against the Defendant-Debtor (in some cases actual

---

[238] *Id.*

[239] *See, e.g., Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 222 (10th Cir. 2013) (citing to *Marks v. Hentges (In re Hentges)*, 373 B.R. 709, 725 (Bankr. N.D. Okla. 2007)). *See also Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1374–75 (10th Cir.1996) (failure to disclose may constitute a false representation or false pretenses under Section 523(a)(2)(A) of the Bankruptcy Code; *Harmon v. Kobrin (In re Harmon)*, 250 F.3d 1240, 1246 n. 4 (9th Cir. 2001) (noting that a debtor's failure to disclose material facts can constitute a fraudulent omission under Section 523(a)(2)(A)); *The William W. Barney, M.D. P.C. Ret. Fund v. Perkins (In re Perkins)*, 298 B.R. 778, 788 (Bankr. D. Utah 2003) (stating that "[a] false pretense as used in § 523(a)(2)(A) includes material omissions, and means implied misrepresentations or conduct intended to create and foster a false impression"); *Manheim Auto. Fin. Servs., Inc. v. Hurst (In re Hurst)*, 337 B.R. 125, 132 (Bankr. N.D. Tex. 2005) (nondisclosure of a material fact when there is a duty to disclose has been held to constitute the type of fraud necessary to except a debt from discharge).

[240] *Sturgeon*, 496 B.R. at 222 (citing *Stevens v. Antonious (In re Antonious)*, 358 B.R. 172, 182 (Bankr. E.D. Pa. 2006)).

misrepresentations and in some cases nondisclosures) clearly fall within the ambits of section 523(a)(2)(A) of the Bankruptcy Code and are nondischargeable.  The court, in its analysis above, found multiple, material misrepresentations and nondisclosures by the Defendant-Debtor with the intent and purpose of deceiving the Plaintiffs-Creditors (on the most significant home project he had ever undertaken).   The Plaintiffs-Creditors justifiably relied upon these material misrepresentations and nondisclosures.  The Plaintiffs-Creditors sustained losses as a proximate result of the material misrepresentations and nondisclosures.  Moreover, the court believes that the material misrepresentations and nondisclosures found above would also fall into the category of "false pretenses" under section 523(a)(2)(A) of the Bankruptcy Code, since when considered collectively, the Defendant-Debtor's actions created a contrived and misleading understanding that the Contract was being complied with—specifically with regards to what piers were being used (and the subsequent striking of the water pipe)—and that the Initial Deposit was being properly and fully spent on the Tomlinsons' Home.  This all ultimately induced the Plaintiffs-Creditors to continue paying draw requests to the Defendant-Debtor.  The court believes that the Defendant-Debtor's conduct and omissions created an overall false impression that induced the Tomlinsons to stay in the Contract longer—ultimately causing them harm.

42.     Accordingly, the court finds and concludes that the $664,590.93 debt owed by the Defendant-Debtor is nondischargeable pursuant to section 523(a)(2)(A) of the Bankruptcy Code.

## IV.     CONCLUSION.

Based on the foregoing, the court will issue a separate Judgment based on these Findings of Fact and Conclusions of Law.  Plaintiffs-Creditors' counsel is directed to submit a form of Judgment.   Such Judgment will be in the amount of $683,975.19—which represents the $664,590.93 found to be nondischargeable plus the $19,384.26 sanction award, for the untimely

disclosure of insurance policies.  All other relief requested by the parties not herein addressed is denied.

**###END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW###**